[No. 5207. Decided July 8, 1904.]

THE STATE OF WASHINGTON, *Respondent,* v. DUKE DEATHERAGE, *Appellant.*[1]

CRIMINAL LAW—BURGLARY — EVIDENCE—COMPETENCY. Where, in a prosecution for burglary, a witness testified that he saw the defendant enter a stable and take away two saddles, and that he notified the police by phone, it is not reversible error to sustain an objection, on cross-examination, to the question why witness did not notify the owners of the stable.

SAME—FLIGHT. Upon a witness' testifying that he saw defendant twenty-five miles from the place where the burglary was committed, and only eight hours thereafter, it is not error to permit the witness to answer the question, "Was defendant under arrest?" it not appearing that the witness was not qualified, and the primary purpose of the testimony being to show the fact of flight.

SAME. Where there is evidence that defendant committed a burglary at 2 o'clock A. M., and upon being discovered, dis-

[1]Reported in 77 Pac. 504.

appeared, and admits that he walked twenty-five miles by 10 o'clock of the same morning, without giving any reason therefor, there was sufficient evidence of the flight of defendant to submit the fact to the jury.

CRIMINAL LAW—TRIAL—FAILURE OF DEFENDANT TO TESTIFY— INSTRUCTIONS. An instruction that no inference of guilt shall arise against the accused because of his failure to testify in his own behalf is not objectionable because the court states that the statute makes it the duty of the judge to so instruct the jury.

CRIMINAL LAW—TRIAL—INSTRUCTIONS AS TO FACT OF FLIGHT. An instruction that evidence of flight of the accused may be considered in determining his guilt, is not objectionable as a comment on the evidence.

SAME. Neither is such an instruction objectionable because it fails to explain that circumstances explaining the fact of flight may be considered, where there were no facts or circumstances to explain or excuse the flight.

BURGLARY—EVIDENCE—SUFFICIENCY—CONFESSION BY ANOTHER— CONFLICTING EVIDENCE—NEW TRIAL. A conviction of burglary will not be set aside as unwarranted by the evidence, because another states positively that he and not the defendant committed the crime, where, upon cross-examination, the witness was unable to state any of the surrounding circumstances, and admitted to having been convicted of a felony and to have occupied the same cell with defendant, and his evidence was squarely contradicted, since a new trial should not be awarded on conflicting evidence where there was evidence clearly sufficient to warrant the verdict.

Appeal from a judgment of the superior court for Spokane county, Kennan, J., entered January 2, 1904, upon a trial and conviction of the crime of burglary. Affirmed.

*Alex. M. Winston,* for appellant.

*Horace Kimball,* for respondent.

ANDERS, J.—The defendant was convicted of burglary upon the trial of an information of which the following, omitting formal parts, is a copy:

"That the said defendant, Duke Deatherage, on the 4th day of November, 1903, in the county of Spokane

and state of Washington, then and there being, did then
and there wilfully, unlawfully, feloniously and burglari-
ously enter in the night time a certain stable there situ-
ate, the property of, and belonging to, C. O. Wilson and
W. M. Moore, copartners doing business as the Klondike
Stables, and then and there used by them as such, in
which certain goods and valuable property of the said
C. O. Wilson and W. M. Moore, copartners as aforesaid,
was then and there kept for use, with intent then and
there unlawfully, wilfully, and feloniously, to steal, take
and carry away the said goods and valuable property of the
said C. O. Wilson and W. M. Moore, copartners as afore-
said, then and there kept for use as aforesaid."

A motion for a new trial was denied, and the defendant
has appealed from the judgment.

The errors assigned and relied on by the appellant
for a reversal of the judgment call in question the ruling
of the court in sustaining objections to certain questions
propounded to witnesses, in refusing to strike from the
records the testimony of the witness McPhee, in giving
certain instructions to the jury, and in denying appel-
lant's motion for a new trial. At the trial the state called
one Fisher, who testified, in substance, that he lived in
Spokane and was employed in a stable adjoining the
Klondike stables; that he was acquainted with the appel-
lant; that on the night of November 3, 1903, he was in
the stable adjoining the Klondike stables on First ave-
nue; that about 1:30 or 2 o'clock on that night his atten-
tion was attracted by the barking of a dog in the Klon-
dike stables; that he went to the rear of the stable and
hid behind an open swinging door; that he saw the appel-
lant coming out of the Klondike stable with a saddle un-
der each arm (which saddles were produced in court and
identified by the witness) ; that the appellant then walked
up the alley and disappeared from sight; that in about

five minutes he returned and went into the stable where
the witness was secreted, and in a few moments came
out leading a horse belonging to the proprietor of the sta-
ble; that when appellant came out, he, the witness, asked
him, "What are you going to do with that horse?" where-
upon he dropped the horse and ran away.

This witness further testified, that he then telephoned
the police station and reported the matter to the police,
and two policemen came up to the barn; that he and the
policemen looked for the saddles, and that he found them
and the bridle, about one hundred and fifty feet from
the barn, in a wagon which was in the alley. On cross-
examination the witness stated that he did not enter the
Klondike stables, after the saddles were taken, until the
next day, and that he reported the taking of the saddles
that night to the police by "phone." Counsel for the defend-
ant then asked the witness the following questions: "Q.
Did you report to Mr. Wilson or Mr. Moore the taking
of the saddles, that night? Ans. I did not. Q. Why
did you not report to Wilson or Moore the taking of the
saddles that night?" This question was objected to by
counsel for the state on the ground that it was imma-
terial. The objection was sustained by the court, and the
defendant, by his counsel, excepted.

It is claimed that this ruling of the court was errone-
ous and prejudicial to the appellant, and it is insisted
that the appellant had the right to know why the wit-
ness did not inform the proprietors of the Klondike sta-
bles that a burglary had been committed; and it is, in
effect, argued in support of this contention that, if the
witness had no good reason for not promptly reporting
the burglary to the proprietors of the stables, counsel for
the appellant could have argued to the jury that, as a

matter of fact, no burglary was committed, or, if that
offense was committed, that the witness himself or some
person other than the appellant committed it.   Although
this interrogatory, as propounded to the witness, may
not be deemed to have been wholly irrelevant or imma-
terial, yet we are convinced that the sustaining of the
objection thereto constitutes no sufficient ground for the
reversal of the judgment.   The witness had already testi-
fied that he reported the burglary to the police, but did
not report to Wilson or Moore that night that the saddles
had been taken from the stable; and it would seem that
the reason why he did not report to them was, at most,
a circumstance only remotely, if at all, material to appel-
lant's defense.   Whether the answer to the question would
have been beneficial or not to the appellant is merely a
matter of pure speculation.   If any inference favorable
to appellant could be drawn from the fact that the wit-
ness did not report the taking of the saddles to Wilson
or Moore, the appellant was certainly entitled to the bene-
fit of it, and his counsel could have so argued to the
jury.

It is next insisted that the trial court erred in per-
mitting the witness McPhee, over appellant's objection,
to answer the question, "Was defendant under arrest?"
and in refusing to strike from the record the statement
of the witness that the defendant was under arrest, when
he saw him at Reardon, Washington, at about 10 o'clock
in the forenoon of November 4, 1903.   These two as-
signments of error are based upon the proposition that
an arrest may be proved in two ways only; first, by
a person who made the arrest or who saw it made; and,
second, by a certified copy of a public record showing
the arrest.   But conceding, without deciding, that this

proposition is correct, still we find nothing in the record showing that the witness was not qualified to testify that the appellant was under arrest at the time he saw him and conversed with him at Reardon. The fact that the appellant was not handcuffed does not show that he was not under arrest. On the contrary, as stated by counsel for the state, this shows, if it shows anything, that appellant was in no way resisting arrest. Nor does the fact that the sheriff was not in the store when McPhee was there throw any light, either one way or the other, on the subject of the arrest of appellant. McPhee was a police officer of the city of Spokane, and he testified that, while he was on the railroad going from Davenport to Spokane, he was informed that appellant was at Reardon, in custody, and that he found him there sitting in a store at the time above mentioned. In fact, it appears that the question of appellant's arrest was not deemed of any special importance by the prosecuting attorney, as there was no attempt to ascertain from the witness the details of the original arrest of appellant, if he was arrested by some person other than the witness himself. If the appellant, as seems to have been the fact, was in the actual custody, or within the power, of McPhee, he was, in contemplation of law, under arrest. *Gold v. Bissell*, 1 Wend. 210, 19 Am. Dec. 480. We think the court did not err either in overruling appellant's objection to the question as to appellant's arrest, or in denying the motion to strike the answer thereto from the record.

Nor do we think the court erred in refusing to strike from the record the entire testimony of the witness Mc-Phee. It is admitted that the primary purpose of the testimony of this witness was to show that appellant had precipitously fled from the scene of the crime with which

he was charged. But the learned counsel for the appellant earnestly insists that such testimony was wholly insufficient to prove flight, and therefore should have been excluded from the consideration of the jury. It is true that the testimony in question was not alone sufficient to establish the fact that the appellant was fleeing from justice, but it was nevertheless competent and material evidence upon that question. It constituted at least one link in the chain of circumstances from which flight might be inferred, and was therefore properly submitted to the jury. That McPhee saw appellant at Reardon, a town twenty-five miles from Spokane, at 10 o'clock in the morning of November 4, 1903, and that appellant told him he had walked all the way from Spokane the night before, is not disputed. And the materiality of this testimony becomes at once apparent, when viewed in connection with the positive testimony of the witness Fisher to the effect that he saw the appellant at or about 2 o'clock in the morning of the same day, carrying saddles from the Klondike stable, in the city of Spokane, and trying to steal a horse from the adjoining stable. Why the appellant walked on that particular night from Spokane to Reardon is not disclosed by the record, and, that being true, it cannot be said there was no evidence of flight on the part of appellant. It is not necessary, in order to prove the flight of one charged with crime, to show that he escaped from jail or from an officer having him in custody, for it often happens that persons conscious of guilt seek safety by flight, even before they are suspected of crime. "The wicked flee when no man pursueth."

The fifth assignment of error is that the court erred in instructing the jury as follows:

"While the statute of this state provides that a person charged with crime may testify in his own behalf, he is under no obligation to do so, and the statute expressly makes it the duty of the court to instruct the jury that no inference of guilt shall arise against the accused if the accused shall fail or refuse to testify as a witness in his own behalf, and the court so instructs the jury in this case."

It is conceded that this charge of the court complies with the letter of the statute, but it is contended on behalf of appellant that it is not within the spirit of the law; and it is urged that the appellant was entitled to an unqualified instruction, without reference to any statute whatever; or, in other words, that the appellant was prejudiced by the statement to the jury that "the statute expressly makes it the duty of the court to instruct the jury that no inference of guilt shall arise against the accused if the accused shall fail or refuse to testify as a witness in his own behalf." It is stated, in effect, by counsel for appellant, that the judge, by this instruction, virtually told the jury that "the law requires me to so instruct you, and for that reason only I do it." This instruction is clearly in accordance with the law, and the statement of the court that it was made its duty, by the statute, to so instruct the jury, did not, in our judgment, abridge or injuriously affect any right of the appellant. Where the jury is properly directed as to the law upon a particular question, the language used by the court is a matter of no special importance. In *State v. Mitchell*, 32 Wash. 64, 72 Pac. 707, this court ruled that an instruction which substantially complies with the provisions of the statute is sufficient, and we think such is the general rule. The instruction now under consideration is not only substantially but literally in the language of

the statute (Bal. Code, § 6941), and is therefore not subject to legitimate criticism.

Upon the question of flight the court charged the jury as follows:

"If you find that burglary was committed as charged in the information, evidence of flight of the accused may be considered in determining the question as to whether he was the one who committed the act."

It is contended by appellant that this instruction is erroneous for the reasons, (1) that there is no evidence of the flight of the appellant, and no evidence of any attempt to escape from the officers; (2) that it comments upon the facts in the case; and (3) that this is not a proper case for such an instruction, and that the instruction fails to state the law correctly. What we have said in discussing appellant's fourth assignment of error disposes of the proposition that there was no evidence of flight of appel-·lant, and therefore a further consideration of the question of flight is unnecessary. Nor do we think that this instruction is violative of section 16 of art. 4 of the constitution, which provides that judges shall not charge juries with respect to matters of fact, or comment thereon. The learned judge made no statement to the jury as to the evidence which had been introduced upon the question of flight. Neither did he make any remarks indicating his own opinion upon that question or suggesting the conclusion which should be arrived at by the jury. In short, he did not "comment thereon."

The contention that this instruction does not state the law is based upon the proposition, if we understand appellant's argument, that the court should have gone further and informed the jury that the circumstances explaining or excusing flight should be taken into consideration, and

no doubt the jury should be so instructed in cases where the evidence warrants such instruction. Wharton's Crim. Ev. (9th ed.), § 750. But, in this case, there were no facts or circumstances explaining, or tending to explain or excuse, the flight of appellant, and, consequently, no countervailing conditions for the consideration of the jury. Although the court might properly have charged the jury that the flight of the accused would not, by itself, warrant a conviction, yet the omission to do so did not, in our opinion, vitiate the instruction as given. Indeed, this instruction plainly implies that a conviction might not be based solely on the fact of flight. In *State v. Gee,* 85 Mo. 647, the supreme court of Missouri approved an instruction couched in the following language:

"The court instructs the jury that flight raises the presumption of guilt, and if you believe from the evidence that the defendant, after having shot and killed Minnick, as charged in the indictment, fled the country and tried to avoid arrest and trial, you may take that fact into consideration in determining his guilt or innocence."

The instruction given in this case does not state that guilt may be inferred from flight, or even, as was said in the Missouri case, that flight raises the presumption of guilt. It simply says to the jury that evidence of flight may be considered in determining whether the accused was the one who committed the offense, and the court committed no error in so charging the jury.

Lastly, it is contended by appellant that the court erred in refusing to grant a new trial on the ground that the verdict was contrary to the evidence. This contention is absolutely untenable. We have read and carefully considered all the evidence contained in the record, and are thoroughly satisfied that it justifies the verdict of the jury.

It is true, one Ingalls, a witness on behalf of the defendant, testified at the trial substantially as follows:

"On the evening of November 3d, about nine or ten o'clock, I called at the Klondike stables and defendant and I went to town and had several drinks together, among other places, at the Judge saloon. About 12 o'clock or thereafter, the defendant left me, stating he was going back to the barn to sleep. After that time I went to the barn, walked into the door, took these saddles from the barn and carried them away. Deatherage was not with me. After I had taken the saddles out, I went upstairs to the place where Deatherage was asleep, and told him what I had done. He remonstrated with me, and said he did not want to have anything to do with it, and if the saddles were taken he would be accused of it."

Of course, if this testimony was true, appellant was entitled to a new trial. But evidently the jury and the judge, having observed the demeanor of this witness and heard his testimony, disbelieved the statements above set forth. And an examination of his testimony as a whole, even as it appears in the record, is sufficient to convince any unbiased mind that it is wholly unworthy of belief. Although he testified positively and without hesitation, in his examination in chief, that he took the saddles from the barn and afterwards went upstairs where appellant was sleeping and told him what he had done, and that appellant remonstrated with him, he was utterly unable to recount the surrounding circumstances, or to give a more detailed account of the transaction. For instance, the following are questions asked this witness on cross-examination, and his answers thereto:

"Q. How many saddles did you take? A. Two. Q. Did you take anything else besides the saddles? A. No. Q. Are you sure about that? A. Yes. Q. From where did you take the saddles? A. I got them in the

stable.   Q.   Did you take the saddles from the same identical place in the stable; were they hanging together at the time you took them?   A.   Yes.   Q.   Where was Deatherage at this time?   A.   Upstairs.   Q.   Did you go upstairs thereafter?   A.   Yes.   Q.   How did you get upstairs—by stairs or by ladder?   A.   I don't know.   Q. Where was Deatherage sleeping—on a bed or on the floor?   A.   I can't tell you.   Q.   Why can't you tell?   A. I don't know.   Q.   Who else, or was there any one else in the room with Deatherage at that time?   A.   I don't know.   Q.   How could you see him—was there a light in the room?   A.   I don't know.   Q.   Describe the room in which Deatherage slept.   A.   I cannot.   Where did you put the saddles after taking them?   A.   I don't remember.   Q.   Which way did you go with the saddles after leaving the stable—north, south, east or west?   A. I don't remember.   Q.   Where have you been during the last two or three weeks?   A.   I have been confined in the county jail.   Q.   In what cell were you confined in the county jail with reference to the defendant Deatherage?   A.   I was confined in the same cell.   Q.   For how long a time were you confined in the same cell with Deatherage?   A.   For several weeks.   Q.   Have you not been heretofore convicted of felony in the county of Whitman, State of Washington, and served sentence by reason thereof?   A.   Yes sir."

It seems plain to us that the testimony of this witness, Ingalls, taken all together, bears upon its face the brand of untruthfulness, and that the jury was fully justified in regarding it as a mere fabrication.   But even if Ingalls' testimony were considered as worthy of serious consideration, it was squarely contradicted by other evidence, which the jury had the right to believe, and did believe, and which was clearly sufficient to sustain their verdict.   Under such circumstances this court has uniformly declined to award a new trial on the ground of in-

sufficiency of the evidence.  See, *State v. Ripley*, 32 Wash. 182, 72 Pac. 1036, and cases therein cited.

We have discovered no error in the record, and the judgment is, therefore, affirmed.

FULLERTON, C. J., and HADLEY, MOUNT, and DUNBAR, JJ., concur.