[No. 29949. Department Two. November 21, 1946.]

THE STATE OF WASHINGTON, *Respondent*, v.
GARLAND WILSON, *Appellant*.[1]

[1]Reported in 174 P. (2d) 553.

H. *Sylvester Garvin* (*Stanley C. Soderland,* of counsel), for appellant.

*Lloyd Shorett* and *Max R. Nicolai,* for respondent.

STEINERT, J.—The defendant was by information charged with the crime of murder in the first degree. Upon the trial, the jury returned a verdict of guilty together with a special finding that the death penalty be inflicted. The court entered judgment on the verdict and sentenced defendant to be hanged. Defendant appealed.

The material allegations of the information read as follows:

"He, the said GARLAND WILSON, in the County of King, State of Washington, on or about the 29th day of December, 1945, with a premeditated design to effect the death of J. N. Raybould, a human being, and while then and there engaged in the commission of the crime of robbery, wilfully, unlawfully and feloniously then and there did beat, stab and wound the said J. N. Raybould with a club, mallet and knife, thereby mortally wounding the said J. N. Raybould from which said wounds the said J. N. Raybould then and there died."

The facts in the case, as the jury was entitled to find them from the evidence, are as follows:

J. N. Raybould, the victim of the homicide, was, at the time of his death, sixty-nine years of age. He owned and

conducted a large grocery store and meat market, known as Raybould's Super Market, located at street number 4721 California avenue, between west Alaska and west Edmonds streets, in West Seattle. In the front, or easterly, portion of the market, the grocery department occupied the northerly half of the building, and the meat department, the southerly half. In the westerly part of the building, particularly in the rear portion of the meat market, were meat lockers, meat blocks, a sausage table, and other store equipment suitable for the handling and disposition of meat. About midway in the length of the building, between the retail displays and the various locker rooms, was an office designated as "outside office," at the corner of which was a large safe, and diagonally opposite that was a smaller, private office designated "inside office." South of this latter office was a lavatory. The southwesterly portion of the building contained a passageway, ten feet wide, leading from the meat lockers and terminating at a door, through which exit was made to an alley at the rear of the building. This door was locked from the inside by means of a steel bar.

Across the street from the market building was a restaurant which fronted westerly on California avenue, and which Mr. Raybould also owned and operated. It was his custom, in the evening when the restaurant closed, to check the registry of sales and take the money over to the market, where he made up his total receipts to be later deposited in a bank in that vicinity. On Saturday nights, after he had made up the deposit slips showing the amounts received from both the market and the restaurant, he would put the money in canvas bags and drop them in a night depository provided by the bank.

Mr. Raybould also customarily carried in his hip pocket a wallet usually containing large sums of currency, some of which were evidenced by one-hundred-dollar bills. Frequently, as an accommodation to other merchants in the neighborhood, he would cash their checks or give them smaller denominations of currency in exchange for larger bills, which he carried in his wallet.

Appellant, Garland Wilson, was a meat cutter by trade, and, at the time of the events here involved, was thirty-one years of age. Sometime in November, 1945, he was employed as a butcher by Mr. Raybould, but was laid off from work about December 23rd of that year. At that time, appellant was living with his second wife and their sixteen-month-old child in a portion of a duplex dwelling located at 1103 Twenty-third avenue south, in Seattle, a considerable distance from Mr. Raybould's market. One Richard Peters, from whom appellant rented, at the same time occupied the other portion of the house.

On Saturday evening, December 29, 1945, at about 7:20 o'clock, Mr. Raybould closed the market and went across the street to the restaurant for dinner. After he had finished his meal, he left the restaurant but returned at about 8:15 o'clock to check the registry receipts. He then went back across California avenue, entered the market, and was never again seen alive by anyone except the person who caused his death.

Early Sunday morning, December 30, 1945, two employees of the "Seattle Disposal," proceeding in their truck along the alley in the rear of Raybould's Super Market, stopped at the back exit referred to above for the purpose of collecting the garbage. They noticed that the door was slightly ajar, and one of them, on going inside, saw the body of a man, covered with blood, lying on the floor. Suspecting that foul play had been committed, one of the workmen stationed himself as guard at the door, while the other ran down the alley to the police station a half block away and reported that something was wrong at the meat market. Two officers immediately went to the place, and a third one followed shortly thereafter. Entering the market from the rear, they recognized the dead man as being Mr. Raybould; rigor mortis had already set in. The officers thereupon summoned detectives in charge of homicide and robbery. Upon arrival of the detectives, thorough inspection of the premises was made. About the same time, the county coroner arrived.

Mr. Raybould's head showed twenty-one distinct cuts with a knife; the palm of one hand had been sliced off; and a number of deep stab wounds were found in the regions of his shoulder, side, and back. Scattered near the body were his glasses, his wrist watch, and a few small coins, and a short distance away lay a broken toy pistol. The front door was locked, with the key on the inside. The floor, which on the day before had been strewn with fresh sawdust, showed signs of a terrific struggle. In addition to a quantity of blood on the floor, blood-smears were found on the wall, also in the inside office, and on the front of the safe, which was partly open. Two bloody towels were discovered in an adjacent sink.

Without disturbing anything in the premises, the officers took a number of photographs showing the scene as it had been left by the assailant. One of these photographs showed the inside of the safe containing canvas money bags. These bags were empty, but blood stains appeared upon them. Examining the body of the deceased, the detectives found the wallet in Mr. Raybould's hip pocket. The wallet was empty, however, and the pocket was buttoned. It was later learned that about seven hundred dollars had been taken from the premises by the malefactor.

What actually transpired on that occasion was learned from appellant's confession made to Detective Captain Richard Mahoney on January 10, 1946, the day after appellant's arrest. The confession was reduced to writing but was not signed by the appellant, for the reason, as given by him, that he wanted first to consult an attorney. The complete statement was identified by the witness Mahoney and was admitted in evidence at the trial. In addition thereto, Captain Mahoney testified at length concerning what the appellant had confessed to him at the time the statement was taken down in writing. We quote the material portion of his testimony:

"Q. Do you—what did he tell you on the morning of January 10th? A. On January 10th he was questioned again about having been in West Seattle, about where he had received the money he had spent and he stated at that

time he wanted to clear the whole matter up, wanted to tell the truth. He was told to go ahead and he proceeded to tell about the whole affair. He said on the afternoon, or early in the evening, of December 29th, that he had reached a point of desperation, that his wife had been giving him a bad time, that he was very much in love with her, that he had no money, had been discharged from Raybould's two days before Christmas. He said she was threatening to leave him and he wanted to get some money. He made up his mind at that time he would get money regardless of how he had to get it; that he accompanied Mr. Peters, his wife and baby to First Avenue and Yesler Way; that he borrowed a dollar from Mr. Peters, as Peters had pawned a suit or suit case; that he walked up First Avenue to the Oliver Meat Market; that he talked to some of his former associates and then went to Kress' ten-cent store where he purchased a toy pistol; that he then went up to the beer parlor operated by Mr. and Mrs. Hunt and that he had a glass or two of beer; that he then went down and took the bus to West Seattle; that he waited around West Seattle and saw Mr. Raybould leave the restaurant and cross the street to the market; that he intercepted him at the market door and told Mr. Raybould he wanted to talk to him about getting his job back; that Mr. Raybould asked him in and they went in there, back to the little office; that he told Mr. Raybould that he would like to go back to work as the only positions he could find were jobs in chain stores; that Mr. Raybould said he was sorry, he had nothing to do with the employment now because he had sold out and Bill Clark was handling the employment; that he became angry at that and said 'You didn't think anything you so-and-so about firing me two days before Christmas and I knew you were going to let me go two days before that but I still stayed with you.' He then asked Mr. Raybould to loan him twenty-five dollars. This Raybould refused to do; that he then said 'Well, I am going to take it.' He pulled the toy gun and told Raybould to get in the back room; that he took him back to the meat locker, that being this locker right here (indicating), with the gun in his back, and forced him inside the door; that Mr. Raybould said 'Garland, they will get you for this,' but that he didn't care; that he closed the door and just as he closed it Raybould opened it again and he told him 'Get back in there or I will give it to you right here.' He then slammed the door again; that he then went out front to the safe which was open; that he was on his knees in front of the

safe when he heard the clutch on the ice box door open. He jumped up and started to the back room and just as he got into the back room, leaving the safe and running over here (indicating) he met Raybould right about in here (indicating), right near the sausage table; that Raybould had a hamburger stuffer in his hand, raised over his head and that he struck at him; that Wilson ducked and his hand or a portion of the hamburger stuffer hit him on his left shoulder and flew out of Raybould's hand; that he then picked up the hamburger stuffer and proceeded to beat Raybould over the head with it; they struggled to the back of the store and as they went back Raybould grabbed a knife from the rack, the knife rack being on that side, and in that knife rack there were several knives. At that point I [the witness] showed him the knife in evidence and asked if that was the knife Raybould had and he said no, he thought it was a small black-handled boning knife. They struggled and he didn't know how but he got Raybould down and the knife away from him; that he then took the knife and started cutting Raybould; that he didn't know how many times he cut him; that he was in a frenzy. He didn't express it just that way. I asked if he used a cleaver and he said he had not. He said he was blank, that he didn't know how many times he had cut him. He said after cutting Raybould he had washed the knife and thrown the hamburger stuffer in a tub beside the sausage or hamburger table; that during the struggle somehow he had cut his left hand, left forefinger; that he took towels and stopped the bleeding as well as he could and washed his hand and finger; that he then went back to the safe and took the money from the canvas bags; that he then went back to Raybould's body and took the money out of his hip pocket and replaced the wallet and buttoned the pocket up and that he then left by the back door and had walked up past the police station to California and Alaska where he caught a taxicab and went back to the beer parlor, Hunt's beer parlor, on Pike; that he stayed there just a moment, went down the street and did take a cab in front of the Waldorf Hotel and went to the Hitching Post. He said it was not true he remained home with the baby [as he had represented in a statement made the day before]; that the baby was in the car and he had met his wife and Peters at the Hitching Post. Q. Did he tell how much money he obtained either from Mr. Raybould or the premises? A. He said he got a total, I believe $560 or $670. It was several hundred dollars. I don't remember the exact

amount. Q. Do you want to refer to anything you have there? A. It is in the statement. Q. To refresh your recollection on that point? A. $675, total. Q. You said they went to the Hitching Post? Q. Will you just continue, if he said anything else at the time? A. They had a few beers at the Hitching Post and they purchased some more beer and come home where they drank a little more beer and went to bed. Later he and his wife had gone to Coeur D'Alene; that he had spent money in the slot machines but had broken about even on the slot machines; that he had a jackpot or two and became about even; that there were some one-hundred dollar bills in the money he got from Raybould's person; that he purchased some clothes in Coeur D'Alene, had visited his mother and made a round of the night clubs. Q. Referring back to the toy pistol, did he tell you anything about that? A. Yes. Q. I think you related he said he purchased it at Kress' ten-cent store? A. Yes, and that he used it to stick Raybould up, or put it in his back and force him into the meat locker and that he didn't know how it had gotten broken."

After completing his confession as narrated at the trial by Captain Mahoney, appellant voluntarily accompanied the officers to Raybould's Super Market and re-enacted the scene according to the description previously given in his confession.

It further appears from the evidence that, on January 2, 1946, four days after the crime was committed, appellant, with his wife and child, went to Coeur D'Alene, Idaho, where he had formerly lived and near which city his mother was then living. He and his wife took a room in a hotel, and the child was placed with appellant's mother. On Friday, January 4th, appellant gave his wife three hundred dollars, and, with that amount, she went to Minnesota to visit her relatives. On the following Sunday, appellant left Coeur D'Alene and arrived in Seattle Monday night, January 7th. He was arrested in his home on January 9th. While in Coeur D'Alene, appellant visited several night clubs and spent much of his time playing slot machines. The cashier at one of the clubs testified that on one of those occasions appellant changed a one-hundred-dollar bill.

At the trial, appellant took the witness stand in his own behalf. He testified that, after going to West Seattle in a bus on the night in question, he watched for Raybould and saw him walking across California avenue from the restaurant toward the market. His version of what thereafter occurred is best presented by quoting directly from his own testimony:

"A. I came and met him at the curb. I said 'Hello' and he said 'Hello.' He could not think of my name. I told him I left my glasses in the store and I wanted a little talk with him. He said 'Sure, come in.' He let me in first. Q. How did he open the door? A. I think with a key. Q. When he got in what did he do? A. He turned and locked it and like anyone will, he tried it. I didn't know he left the key in the door. . . . Q. What occurred? A. . . . I walked back and started looking through these cigar boxes for my glasses. He turned and went into his office. I looked around for fifteen or twenty seconds and then came back. I said 'Mr. Raybould, I just came from the union hall and they said you had a call in for three meat cutters. How about a job?' He said 'It is entirely out of my hands, and in Mr. Clark's.' He said he was going to start operating the place the next week. I said 'You laid me off two days before Christmas and I knew I was going to be laid off and I still stayed. You still own it. I don't see why you give [sic] me my job back. I have upheld my part and I know about meat cutting.' I said 'You owe me money I have coming.' He said 'What money?' I said 'Five dollars a week you promised me. You said you would pay the end of November and then you asked if you could pay me the end of this month and instead you let me go before the end of December.' He said 'No, I will not give it to you.' I said 'Will you lend me twenty-five dollars until I can get a job?' He said no. I had this little toy gun. I didn't know what I was going to say or do. But I never thought of holding up anyone. I didn't do anything. He went in the lavatory. When I came in the office that evening the safe was closed but the safe handle was turned upward, showing it was not locked. I knew he would be back. I pulled out a wooden drawer, what was in it I didn't know. It was quite dark in the private office. There was no light in there. I grabbed a handful and closed the door. There was a heavy galvanized money box. I opened the office door and stepped in

and laid the money box on the end of the desk. . . . Q. Lying on the desk? A. Yes, on the desk. Q. In the private office, but not in the safe? A. Yes. I took this money. I didn't know how much was there. I didn't know what denominations or bills. I just stuck it in my pocket. I got back to the cigar boxes. . . . Mr. Raybould came out and I said 'Will you let me out? I cannot find my glasses.' He said 'Just a minute' and he went back into his office. I didn't know what to do. I knew the front door was locked. Q. How did you know it? A. He had tried the door when he came in. I just stood there. He went into his office and in ten or fifteen seconds he came out. . . . I thought he was going to the ice box. Then he came at me with the hamburger stuffer. He reached on the table and got the hamburger stuffer. He had it in his right hand and took a swing at me. I ducked and slipped and fell at the end of a large electric saw. . . . Q. Then what happened? A. I said 'Please let me out, sir. You can call the police if you want to.' He didn't say anything to me. I turned around and thought the only chance was for me to get out the back door. He had a black handled boning knife, not the knife they have here but a six-inch blade. I told Captain Mahoney when they took me out there Thursday. They wanted me to go through this for them. Captain [Mahoney] testified I didn't say this. I noticed Mr. Raybould coming with the black handled knife. He had it in his left hand. I knew he was right handed but he had it in his left hand. I must have lunged at him. That is when I started yelling to let me out. I grabbed him by the hand with my right hand. I must have got hold of the blade with my index finger but I had no recollection of ever being cut at that time because I was so frightened and I was in a frenzy. I was trying to shove him back and I pleaded with him 'I will give you what I have. I don't know what I have. I will give it to you and you can call the police.' Q. Did he know you had the money? A. He must have. Q. Did he accuse you? A. He mentioned it when he started to strike me with the mallet, when he raised the mallet. He said 'I will learn you to rob me, I will teach you not to take my money.' I had hold of his hand and he was pulling me with his right hand. . . . I shoved him backward. His back heel must have caught and he fell and cracked his head on one of the boxes. We rolled around on the ramp. I could not say how long. All I knew was I was not getting out of the store unless I did something. I didn't see the knife

any more. . . . I jumped up and he was getting up. I picked up the mallet, the hamburger stuffer and he met me just beyond the electric saw. I didn't see him have any knife in his hand until he got on me. He had it in his right hand, the black handled knife, boning knife. I got him in the elbow. I was going to try and get out. He knew who I was. He could call the police, and I told him so: I feared for my own life when I saw he had this knife. I struck him with the mallet, how many times I don't know. Then I dropped the mallet and went close to his body and grabbed him. It was slippery and we both went down. He hit his head on a box that was out in there at the time. I got up and what I did I don't know. The next thing I remember I was at the sink. My whole face was all covered with blood and my lips were all swollen up. I started to wash. I didn't know what to do. . . . I washed my face with a towel and then I washed my hands and noticed my hand was cut. I remembered Mr. Raybould had bandaids in his office. They were never in the back room. They were always in one of the two offices. I went in there. I was looking around trying to see if I could find the box with the gauze and I could not find it. I noticed the gun lying there. Q. Did you touch the gun? A. No. I could not find the bandaid, so I got the bag out. The officers showed me the bags in the safe. To my recollection I don't know how they got there. I left them where I saw them. Q. Did you get money out of any bag? A. No, sir, I did not. I went back to the sink and was washing my hand. Then I went back to the sink and took this mallet and picked it up off the floor and dried it off. I then took the knife over to the sink and washed it and placed it by the sink in the rack."

It will be noted that appellant's testimony at the trial differed from his former confession in two principal respects: (1) In his confession, he stated that he used the toy gun to force Mr. Raybould into the meat locker and then rifled the safe; while in his testimony he stated that he stealthily took the money during the time Raybould was in the lavatory where he had voluntarily gone; and (2) in his confession, he stated that he took the money out of the canvas bags in the safe and from the person of the deceased *after* the physical encounter had ended, while in his testimony he stated that what money he did take he

took *before* the struggle occurred. The significance of these changes will become apparent when we come to the consideration of appellant's assignments of error.

Appellant finally testified at the trial that, after leaving the place of the homicide, he had disposed of his raincoat, which had blood upon it, by hiding it in an alley, and that, after he had returned home in company with his wife and Peters, he (the appellant) and Peters burned some of the clothing which he had been wearing during the commission of the homicide. In this he was corroborated by his wife, who also testified that appellant had told her that same evening that he had killed Mr. Raybould.

We will now consider appellant's assignments of error. His first assignment is that the trial court erred in refusing to give two requested instructions which read as follows:

No. 17. "You are further instructed that if you find from the evidence, beyond a reasonable doubt, that the defendant, [appellant] did commit the crime of robbery, but that the said crime or attempt or withdrawal was completed prior to the time of the killing charged in the Information herein, then I instruct you that the defendant would not be guilty of the crime charged in the Information, and your verdict should be NOT GUILTY."

No. 18. "I charge you that 'withdrawal from the scene of a felony' as used in a legal sense, is meant the act of escaping from the scene of a felony, and unless you find that the homicide occurred during the commission of, or while withdrawing from or returning towards the scene of the felony, considering the word 'withdrawal' as heretofore defined, I charge you that you should find the defendant NOT GUILTY."

By these requested instructions, as applied to his testimony, appellant endeavored to invoke the law of self-defense.

It will be observed that these instructions, considered by themselves, call for a positive ruling that, even though the crime of robbery was committed, nevertheless the mere completion of "the crime, or attempt, or withdrawal, prior to the time of the killing" entitled the accused to a verdict of not guilty of the crime of murder as charged in the information. Such an instruction would leave out of con-

sideration entirely not only all reference to any violence thereafter committed by appellant upon the decedent and the occasion therefor, but also any question as to the real or apparent necessity for the killing in order to save the killer himself from death or great bodily harm, or as to the necessity for the employment of the particular measures adopted by him to effect the death of his victim, or as to his honesty and good faith in taking the life of the decedent.

The right to kill in self-defense is founded in necessity, real or apparent, and the law which accords such right is available only to those who, in asserting the right, act honestly and in good faith.

It is settled law that one who was the aggressor or who provoked the altercation in which he killed the other person engaged in the conflict, cannot successfully invoke the right of self-defense to justify or excuse the homicide, unless he in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action. 40 C. J. S. 987, Homicide, § 117.

In 26 Am. Jur. 257, Homicide, § 146, it is said:

"One cannot successfully assert self-defense to excuse or justify the killing of an assailant where he, and not the person killed, is the aggressor in the conflict, or he provoked it. Generally speaking, whenever a party by his own wrongful act produces a condition of things wherein it becomes necessary for his own safety that he take life or do serious bodily harm, the law wisely imputes to him his own wrong, and its consequences, to the extent that they may and should be considered in determining the grade of offense, which, except for such acts, would never have been occasioned."

In *State v. Turpin*, 158 Wash. 103, 290 Pac. 824, this court expressly approved the following instruction:

"You are instructed that no man can by his own lawless acts create a necessity for acting in self-defense and thereupon assault and injure or kill the person with whom he seeks the difficulty, and then interpose as a defense the plea of self-defense. Self-defense is the plea of necessity as shield only to those who are without fault in occasioning

an affray, and acting under it. Therefore, if you find from the evidence beyond a reasonable doubt that the defendant was the aggressor and that by his own acts and conduct he provoked or commenced the affray, then the plea of self-defense is not available to him."

If appellant's version of the facts, as claimed in his testimony and as distinguished from his confession, be true, then no antecedent robbery at all was committed by him, but only the crime of grand larceny. This is so for the reason that his testimony was offered to prove that he took the money, not by employing force or producing fear, but rather by stealth while Mr. Raybould was in the lavatory.

In *State v. Daniels,* 119 Wash. 557, 205 Pac. 1054, this court held that the offense of larceny is a continuing one, and that the killing of an officer by thieves while in possession of an automobile which they had stolen the night before constituted murder. Accord: *State v. Ryan,* 192 Wash. 160, 73 P. (2d) 735; *State v. Anderson,* 10 Wn. (2d) 167, 116 P. (2d) 346.

Under the rule laid down in the cases just cited, appellant's theory of a completed offense of larceny or a withdrawal prior to the killing has no support in law.

On the other hand, under the evidence submitted by the state, a robbery was committed, and this was being perpetrated during, and as a part of, the homicide. In that event, the requested instruction would clearly be inapplicable, because, under Rem. Rev. Stat., § 2392 [P.P.C. § 117-5], the killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed by a person engaged in the commission of the crime of robbery.

As indicated above, the requested instructions failed to include any statement with reference to a real or apparent necessity for the killing, or for the employment of the measures taken to cause the decedent's death, or with reference to the honesty and good faith of the appellant in his alleged withdrawal from the combat.

It is the rule in this state that it is not error to refuse to give a requested instruction unless it is substantially correct and such as the court might give to the jury without modification or omission, since no duty rests upon the court, in the midst of a trial, to pause and of its own motion correct a requested instruction and then give it as corrected. *Nollmeyer v. Tacoma R. & Power Co.*, 95 Wash. 595, 164 Pac. 229; *State v. Woods*, 163 Wash. 224, 1 P. (2d) 219. Since appellant's proposed instructions contained none of these essential elements, under the evidence of the case, they were not substantially correct, and the trial court was therefore not obliged to give them in the form requested nor of its own motion correct them.

In this connection, it is but proper to say that the trial court did give an instruction on self-defense, consonant with the law and as favorable to the appellant as he could rightfully ask.

Appellant's second assignment of error is directed against an instruction given by the trial court to the effect that, if the jury should be convinced beyond a reasonable doubt that the act alleged as constituting the crime charged in the information was committed and should further find that the appellant immediately or soon thereafter fled from the place where the alleged act was committed, then such flight is a circumstance to be considered by the jury in connection with the other evidence in the case.

Appellant does not challenge the correctness of this instruction, but contends that, under the evidence, the jury could not properly have made a finding of flight.

It is generally held that evidence of flight is admissible. The rationale of the principle is that flight is an instinctive or impulsive reaction to a consciousness of guilt or is a deliberate attempt to avoid arrest and prosecution.

The prevailing rule on the subject in this country is that the flight of a person after the commission of a crime and before his arrest is a circumstance to be considered with the other circumstances of the case in determining his guilt or innocence. See 25 A. L. R. 886 *et seq.*, where the cases are collated. That is the rule in this jurisdiction.

*State v. Stentz,* 33 Wash. 444, 74 Pac. 588; *State v. Deatherage,* 35 Wash. 326, 77 Pac. 504; *State v. Pettit,* 74 Wash. 510, 133 Pac. 1014; *State v. Pettit,* 77 Wash. 67, 137 Pac. 335.

In the first of the *Pettit* cases cited above, this court said:

"To constitute flight it is not necessary that there should be an escape from jail or from an officer, but it may consist in a departure from the place of the crime by one conscious of guilt, even before suspected of the crime."

■ Although appellant claims that the killing was committed in self-defense, the evidence as narrated above reveals that, after the crime had been committed, appellant paused just long enough to wash himself and dry some of the instruments which had been used by him, then hurriedly left by the back exit, proceeded down the alley, passed the police station in that vicinity, hailed a taxicab, and went to a distant part of the city. That same night, he either burned or otherwise disposed of the clothes which he had been wearing at the time of the homicide. Knowing that an investigation was in progress, he left the state and remained in Idaho four days. It is true that he thereafter returned to Seattle, but there was also evidence that he had formerly been convicted of embezzlement, for which he was given a suspended sentence; that he was still on parole; and that he was required to make regular reports to a probation officer in Seattle. The jury was entitled to consider all of these circumstances in determining whether appellant departed from the scene of the crime and later went to Idaho because he was conscious of his guilt. There was no error in giving the instruction on flight.

Appellant's final assignment of error is that the trial court improperly permitted the prosecuting attorney, over the objection of the appellant, to bring out the details of a prior conviction and of the crime there involved, and further permitted the prosecutor to show a prior crime upon which there had been no conviction.

The circumstances relating to this assignment are these: In his opening statement outlining the evidence to be produced by appellant, his counsel told the jury that appellant had once been postmaster at Hayden Lake and, while hold-

ing that position, had been taken before the Federal court in Idaho and had received a suspended sentence; that since then appellant had gotten behind in the payments which he was required to make to a certain bonding company; and that, in the latter part of December, 1945, his mother, knowing his financial difficulties, had promised by letter to send the necessary money to that company.

On direct examination, appellant testified that, while holding the position of postmaster in Idaho, he had been indicted by a grand jury, and had pleaded guilty to the crime of embezzlement; that one of the conditions of his release on probation was that he was to pay back to his surety, a bonding company, the amount of the shortage; that later a further shortage was discovered, which the bonding company paid, and which he was supposed to repay to the company; and that he had become in arrears in his payments during the time he was on probation.

On cross-examination, the prosecutor was permitted to elicit from the appellant the amount of the embezzlement, the number of counts in the indictment, the conditions of his parole, the amount of the shortages still owing by him to the bonding company, and certain details of his reports to the probation officer while appellant was still on parole.

■ Under the provisions of Rem. Rev. Stat., § 2290 [P.P.C. § 112-69], the state had the right to show former conviction not only by the record of conviction, but also by other competent evidence, or by cross-examination of the appellant, and, in the last-mentioned instance, appellant was by the statute required to answer any proper question relevant to the inquiry. *State v. Steele*, 150 Wash. 466, 273 Pac. 742; *State v. Brames*, 154 Wash. 304, 282 Pac. 48. The evidence elicited by the prosecutor was relevant to the inquiry.

■ Furthermore, appellant on his direct examination having gone into the matters pertaining to his former conviction, the door was thereby opened for cross-examination upon the same matter. *State v. Howard*, 137 Wash. 172,

242 Pac. 21; *State v. Johnson,* 180 Wash. 401, 40 P. (2d) 159; *State v. Kelly,* 187 Wash. 301, 60 P. (2d) 50.

We find no error in the record, and the judgment is therefore affirmed.

MILLARD, C. J., SIMPSON, MALLERY, and SCHWELLENBACH, JJ., concur.