[No. 125-2.    Division Two.    October 15, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSEPH H. BROWN, *Appellant*.

*Garver & Garver* and *Robert W. Garver*, for appellant.

*R. DeWitt Jones, Prosecuting Attorney*, and *R. L. Harris, Deputy*, for respondent.

PETRIE, J.—Defendant, Joseph H. Brown, charged with the crime of first-degree assault, was convicted of and sentenced for the crime of second-degree assault. He has appealed to this court, assigning error to the trial court's instruction to the jury No. 9:

You are instructed that the Court has removed as an issue for the jury to consider those issues relating to the claim of self-defense.

In view of the court's determination, as a matter of law, defendant was prevented from arguing to the jury that his actions were motivated by defense of his person. We have therefore reviewed the record in an attempt to glean therefrom factual assertions and events most favorable to the defendant's contention.

Defendant and Paul Robertson were both employed on the swing shift at the Camas, Washington, plant of Crown Zellerbach Corporation as forklift drivers. Some time between 9 and 10 p.m. on May 8, 1969, Robertson and defendant Brown became embroiled in an argument stemming initially from Robertson's dislike of what he described as Brown's unwarranted tooting of the horn on his (Brown's) forklift. Robertson used the primary drive chain of a Harley 74 motorcycle as his waist belt. The chain belt was described as about 1 inch wide and ¼ inch thick. There is testimony, which the jury could have believed, that at one point in this argument Robertson removed his belt, displayed it menacingly toward Brown, and declared, "I'll break both your legs." At that point, if the incident occurred, Brown remounted his forklift truck and drove away. Brown came back a little bit later, and Robertson declared, "Come on man, come in the boxcar, come on in the boxcar." The disputants did not see each other again until some time after the termination of the work shift.

Brown punched out at 12:58 a.m., walked to his parked automobile, removed from the glove compartment a .25 caliber pistol, and then proceeded to a tavern across the street from the plant gate. By the time he arrived at the tavern, which appears to have been about 1:30 a.m., Robertson and several acquaintances were also there, sitting at a table drinking beer.

Brown seated himself at the bar, had two or three 6-ounce glasses of beer and tomato juice. Now armed, but with the pistol concealed, Brown left the bar stool and

walked over to the table at which Robertson was sitting. Until this point, there was no exchange of word or action between the parties. Brown did not testify at the trial, but a tape explaining his version of the affray, taken the following morning before the Camas chief of police, and played back to the jury, described defendant's version of the scene as follows:

> And this guy, I called him Red, he had made the brag earlier that he was going to work my head over, and so I was getting up ready to leave so I figured I'd better give him his chance if he really wanted to come after me.

All the evidence indicates that when he reached Robertson's table, Brown spewed out a series of vulgarities directed toward Robertson (Red), the details of which we shall not record. The final opprobrious remark, however, was clearly designed to bestir the most insouciant soul. The record is somewhat conflicting as to precisely when Brown first displayed the pistol, but the tape records the events following the verbal exchange as follows:

> He jumped up from the table and kicked his chair back, and before he was even completely up from the table he had the chain wrapped around his hand and was making a dive for me, and I backed up about six or seven feet, and I told him he better not do it, and he said "I can knock it out of your hand before you can even pull the trigger." And I said "Don't try it, man, don't try it, I wish you wouldn't try it." And he drew back, and in my mind he had every intent in the world of hitting me with that chain.

Robertson's boast, if he made it, proved to be incorrect. Brown pulled the trigger. The projectile entered the side of Robertson's chest, pierced his right lung in two places, tore through the diaphragm, nicked the top of his liver, and came to rest lying freely against his backbone. Robertson fell to the floor prior to completing his swing. He has since recovered from the bullet wound.

We do not in any manner condone the earlier threatening activities of the ultimate victim, Robertson. Nevertheless, we do affirm the trial court's instruction, which removed consideration of self-defense from the jury. When Brown

left the bar stool, he was not then in any manner threatened or being goaded by Robertson into a contest. The lapse of approximately 4 hours from the encounter at work had given each party sufficient time to cool off from the heat of the affray. In fact and in law, both parties had withdrawn from that encounter. The experience undoubtedly resulted in a continuing feeling of ill will between the parties; but the encounter itself had clearly terminated.

Brown's own assigned reason for approaching Robertson's table 4 hours later in the tavern, his deliberately provocative actions after arriving there, coupled with his armed capabilities, unmistakably brand him as the party who provoked the assault. *State v. Hawkins,* 18 Ore. 476, 23 P. 475 (1890).

■ The plea of self-defense is available to an aggressor only under limited circumstances. The rule has been clearly pronounced in this state:

> It is settled law that one who was the aggressor or who provoked the altercation in which he killed the other person engaged in the conflict, cannot successfully invoke the right of self-defense to justify or excuse the homicide, unless he in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action.

*State v. Wilson,* 26 Wn.2d 468, 480, 174 P.2d 553 (1946).

Under the defendant's own version of the encounter, there was simply no evidence, nor any reasonable inference from the evidence, to permit the jury to find Robertson had been clearly advised that Brown "in good faith was desisting, or intended to desist, from further aggressive action."

Certainly, so long as Brown continued to hold the gun in his hand, prepared to shoot, neither the backing up of 7 feet from the table nor the slightly admonitory phrase, "I wish you wouldn't try it", cannot under any circumstance be indicative of an intent to discontinue the assault.

Judgment affirmed.

ARMSTRONG, C. J., and PEARSON, J., concur.