[No. 42756. En Banc. September 20, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID GENE CRAIG, *Appellant.*

778

*Mark E. Vovos,* for appellant (appointed counsel for appeal).

*Donald C. Brockett, Prosecuting Attorney,* and *LeRoy C. Kinnie, Deputy,* for respondent.

ROSELLINI, J.—The appellant and James Ethan Davis, Jr., were tried together and have taken separate appeals from judgments entered on verdicts of guilty of the crimes of robbery and murder in the first degree. Evidence before the jury showed that these two young men hailed a taxicab in downtown Spokane and directed the driver to an area on the outskirts of the city where they stabbed and beat him to death; that they left his body beside the road and drove the cab to the edge of a river where they abandoned it after attempting to submerge it; and that along the way they threw various items from the car, including the victim's hat and wallet and a small "ditty bag," all of which bore signs of having been searched.

The defendants were apprehended the following evening. At the trial both took the witness stand and testified concerning the killing. They admitted that they had intended to rob the driver when they boarded the taxicab but maintained that they had abandoned that intent prior to the attack on the victim and that this attack was the result of "rage reaction," induced by drugs which they had previously administered to themselves, and precipitated when the cab driver, mistakenly thinking that one of them was

reaching for his wallet or money bag, struck at them with a lug wrench. It was their theory, argued to the jury, that, if they did not have the intent to rob at the time of the attack, the killing was not a "felony-murder" and they were consequently guilty only of manslaughter. They admitted that they took the taxicab and disposed of various items which they found in it after the killing and did not claim that these acts were unintentional. According to their theory, however, this appropriation of the property of another could not be robbery because, the driver being dead at that point, it was not accomplished by force or by putting the deceased in fear.

This novel theory of defense was vigorously urged at the trial and is earnestly argued on appeal, but without citation of authority which tends to lend it validity. We will discuss the theory further as we take up the assignments of error which relate to it.

It is claimed that the trial court erred in refusing to allow a medical expert to give his opinion that the appellant did not intend to commit robbery at the moment he began to stab the taxi driver. The cases which he cites in support of his claim of error in this regard are cases which hold that, where the crime charged involves a specific intent, as opposed to a general criminal intent, evidence tending to prove that by reason of a mental condition, the defendant was incapable of forming such an intent is admissible. *State v. Ferrick*, 81 Wn.2d 942, 506 P.2d 860 (1973), is a recent case which enunciates this principle. The trial court advised the appellant's counsel that he might ask the doctor whether, in his opinion, the appellant's state of mind, as a result of the use of drugs, was such that he was incapable of forming the intent to commit robbery. This counsel declined to do.

For at least two reasons, the trial court properly refused to allow the appellant's counsel to elicit the doctor's opinion as to what the appellant's intention was at the time of the killing. First, the rule is that a doctor who was not a witness to the crime and does not have firsthand knowledge

of the defendant's state of mind at the time, may not give his opinion as to what that mental state was. *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970); *State v. Farley,* 48 Wn.2d 11, 290 P.2d 987 (1955); *State v. Davis,* 6 Wn.2d 696, 108 P.2d 641 (1940).

It would have been surprising to find a medical expert willing to testify that the appellant was incapable of forming an intent to rob, in light of the appellant's testimony. He admitted that he and Davis had entered the taxicab intending to rob the driver, and that they discussed their plan with each other while seated in the back seat. He testified that pursuant to the plan, they gave directions to the driver to take them to a "make-believe" or "fictitious" address, and that he, the appellant, placed on the floor at his feet a knife which he planned to use to intimidate the driver when he snatched his "money bag" and which was used in the actual stabbing. The codefendant took off his belt and laid it across his lap, intending to use it to throw it around the driver's neck and hold him while the appellant grabbed his "money bag." It was only when the driver had stopped the taxicab to get a road map from the trunk and the codefendant Davis thought he saw him take a lug wrench from the trunk, that the two allegedly decided to abandon the robbery plan.

These are not the acts and designs of persons incapable of forming an intent to rob and it is in fact not a lack of capacity upon which the appellant relies, but rather an asserted defense that he had abandoned the intent to rob before the killing took place and was not thinking of robbery while he was in the act of committing the homicide. This brings us to a consideration of the second reason why the court did not err in refusing to allow the doctor to be questioned about the appellant's intent at the time of the killing—namely, that the appellant's state of mind at the time of the killing was immaterial, no defense of insanity having been interposed.

There is no contention that the alleged abandonment of criminal intent was communicated to the driver. That the

driver had become suspicious of the pair's intentions was manifest by this time, according to their testimony, and they did and said nothing to allay these suspicions. On the contrary, they continued to pretend to be searching for an address and did not put their weapons away.

The appellant's theory assumes that regardless of these admitted facts, it was incumbent upon the state to show that he entertained, at the precise moment when the fatal attack was begun, the intent to commit robbery. If this was not a part of the state's burden, evidence of such mental state was irrelevant and other assignments of error relating to this defense are equally without merit. We turn to the statute.

RCW 9.48.030 provides:

The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either—

. . .

(3) Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery,

. . .

Nowhere in the statute is the state of mind of the defendant at the time of the killing made an element of the offense. Speaking of this statute in *State v. Whitfield,* 129 Wash. 134, 138-39, 224 P. 559 (1924), we said that it substitutes the incidents surrounding certain felonies for the premeditation, deliberation or malice which otherwise would be necessary to constitute first-degree murder, and it is unnecessary to prove that the person who kills another in the commission of such a crime or the attempt to commit it or in withdrawing from the scene of its commission, had any malice, design or premeditation. In that case, the killing had occurred in connection with a rape of the victim. The defendant contended that the state should have designated in the information whether the killing took place during an attempt, consummation or flight. This court said:

The proof of the killing, together with the fact that it

was committed in connection with a rape, is sufficient to constitute murder in the first degree. From the very nature of things—and the evidence in this case illustrates the situation as well as any case could—it is often impossible for the state to know at just what instant a killing was committed, whether it was done in the commission of a felony, or in attempting to commit a felony, or while withdrawing from the scene of a felony. The facts here show that there were blows on the head of the child which may have been inflicted before the rape took place, or after the rape had been committed, or may have been inflicted while the accused was withdrawing from the scene. The child's throat was also cut, and the same uncertainty exists as to when that mortal wound was inflicted. It is impossible to tell whether the wounds to the head or throat occasioned the death. Under such circumstances, to compel the state to make a choice as to the exact instant that an unwitnessed killing took place is, by a technicality, to embarrass justice. The real charge against the appellant was the killing; the rape was an incident qualifying the homicide as murder in the first degree. *State v Fillpot*, 51 Wash. 223, 98 Pac. 659. He was charged with one crime and only one, and if the killing took place while the appellant was concerned in a rape, it is immaterial if it was during the attempt, consummation or flight.

Here the appellant was charged with both felony-murder and robbery, but what was said by the court in that case about the murder charge is equally applicable. The burden was on the state to show the killing by the defendant and that it was done in connection with the robbery, as a part of the same transaction. It was not incumbent upon it to prove the state of mind of the defendant at the time of the killing. The appellant and Davis, being the only living witnesses to the crime, know precisely what happened. The state could prove that there was a robbery and a murder. It could not prove what the defendants were thinking when they committed the murder, except by inference from the circumstances. Having killed and robbed the victim, the appellant cannot now be heard to say that his intentions were pure when he administered the blows which resulted in the death of the victim.

■ Nor does the fact that the homicide occurred before the robbery was consummated change the character of the latter offense. In *State v. Coe*, 34 Wn.2d 336, 341, 208 P.2d 863 (1949), we said:

> The final contention made is that one cannot be guilty of robbery if the victim is a deceased person. As an abstract principle of law this is true, as essential elements of the crime of robbery would necessarily be lacking. However, that principle cannot apply here, because the robbery and the homicide were all a part of the same transaction, and the fact that death may have momentarily preceded the actual taking of the property from the person does not affect the guilt of the appellant in the commission of the crime charged.

In accord are *State v. White*, 60 Wn.2d 551, 374 P.2d 942 (1962), and *State v. Temple*, 5 Wn. App. 1, 485 P.2d 93 (1971).

Since the statute does not require the state to prove the intent with which a murder is committed, when it is done in connection with the perpetration of a robbery, mere lack of an intent to rob at the moment of the killing is not a defense. The court's refusal of instructions embodying this theory was not error.

Error is assigned to the refusal of the appellant's requested instruction embodying his theory that he acted in self-defense. The requested instruction assumed that the jury could reasonably find, upon the evidence, that the taxicab driver's alleged act in striking at the defendant with a lug wrench was without provocation. The requested instruction did not correctly state the law applicable to the admitted facts.

■ It is the rule that one who was the aggressor or who provoked the altercation in which he killed the other person engaged in the conflict, cannot successfully invoke the right of self-defense to justify or excuse the homicide, unless he in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action. *State*

*v. Wilson,* 26 Wn.2d 468, 174 P.2d 553 (1946). Here the appellant admittedly engaged in conduct which gave the victim good cause to believe that he was threatened with bodily harm. He did not abandon his threatening behavior or give the driver any reason to believe he was no longer in danger. If, as he testified, the driver struck at the appellant with a lug wrench when the appellant leaned over the front seat of the car, he was justified in doing so, under the admitted circumstances, and the appellant cannot avail himself of a claim of self-defense.

We need not decide whether, in any case in which it is shown that the defendant committed one of the felonies listed in the statute in connection with the killing, he can be permitted to maintain a plea of self-defense.

█ It is contended that the trial court erred in allowing a rebuttal witness to testify that the codefendant Davis had said, while he was in custody after his arrest, that the appellant had refused to agree to abandon the robbery plan. The theory of the appellant is that this evidence was inadmissible because it was hearsay. We need not decide whether the hearsay rule would require the exclusion of such testimony. As we have said, the appellant could not exonerate himself from the charge by showing that at the moment of the killing he had temporarily abandoned the intention of committing a robbery. However, he offered evidence on this collateral issue, and it was admitted. The testimony which is complained of was offered only to rebut the testimony of both defendants that they had agreed to abandon their plan. Since it did not pertain to a matter material to the issues before the jury, and since the facts necessary to warrant a conviction were admitted by the appellant and corroborated by other evidence, it cannot be reasonably presumed to have affected the verdict. Assuming there was error in admitting it, the error was harmless. A prejudicial error, which will justify the setting aside of a verdict and granting a new trial, is one which affects or presumptively affects the final result of the trial. *State v.*

*Beard,* 74 Wn.2d 335, 444 P.2d 651 (1968); *State v. Schrager,* 74 Wn.2d 75, 442 P.2d 1004 (1968).

It is next contended that the man who furnished the knife which was used in the slaying, one Cossins, should not have been permitted to testify concerning statements which were made to him by the codefendant Davis out of the presence of the appellant. At the appellant's request, the court instructed the jury that the evidence was to be considered only with reference to the defendant Davis. However, the appellant contends that the testimony was so prejudicial that it could not be cured by a cautionary instruction.

According to the witness' testimony, Davis, when he returned the knife to him, told him what had happened in the taxicab. While the witness did not testify to any statement made by Davis expressly involving the appellant, his testimony generally described what Davis had said that "they" had done. Most of the account was in harmony with the appellant's own testimony. However, Cossins' account of Davis' story did not support the claim that the defendants had abandoned the intention to rob the taxicab driver before the killing occurred. Since, as we have held herein, this claimed abandonment did not constitute a valid defense to the crime charged under the circumstances of this case, and since the acts admitted by the appellant were sufficient to sustain his conviction, we think the limiting instruction given by the court was sufficient to avoid prejudice to the appellant.

Error is assigned to the admission of testimony by a Dr. Lambert who examined the appellant the night of his arrest, and who testified that the appellant did not appear to be under the influence of drugs or to be suffering from withdrawal symptoms. The doctor's testimony was offered to rebut the inference of incapacity arising from the testimony of the appellant that he was addicted to drug use and had taken heavy doses of drugs on the day of the crime. It was the appellant's theory that the effect of the drugs on his brain caused the violence with which the taxicab driver

was attacked and made it impossible for him to form any intent to commit a robbery when he was in the process of stabbing the taxicab driver. The objection made to the rebuttal testimony is that the examination was conducted at a time so remote from the crime that it was not probative.

■ Since the appellant's state of mind at the time of the killing was irrelevant, there being no plea of insanity, this rebuttal testimony could not have been prejudicial, assuming it had no probative value. The objection, however, goes to its weight and not to its admissibility, a matter which could be and was argued to the jury. We find no abuse of discretion in admitting it.

Prior to the trial, upon application of the prosecutor, a search warrant was issued to obtain samples of the defendants' blood to determine the blood type of each. It was the prosecutor's purpose to forestall a possible claim on the part of the defendants that blood stains found on their clothes were their own blood and not that of the victim. The appellant maintains that there is no statutory authority for such a procedure. He cites *Rochin v. California*, 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205, 25 A.L.R.2d 1396 (1952). The court held in that case that the unauthorized pumping of the defendant's stomach to secure morphine which the state later used as evidence against a defendant resulted in the denial of a fair trial. In that case, the evidence which was obtained without proper authority was admitted at the trial. Here the results of the blood test were neither offered nor admitted, and the taking of the tests could not have affected the verdict. The cited authority thus has no application.

■ At the trial, the appellant stipulated that his blood type was group B. It is not claimed that the stipulation was coerced. Where a party participates in the introduction of evidence and does not object, he cannot complain later of its admission. *State v. Benson*, 58 Wn.2d 490, 364 P.2d 220 (1961).

The appellant maintains that he was denied a fair trial

because there were no persons between the ages of 18 and 21 years on the jury list, contending that persons of that age were systematically excluded. He does not claim that such persons were eligible to serve at the time the jury list was compiled (before June 1, 1971), but suggests that since the legislature enacted a statute, Laws of 1971, 1st Ex. Sess., ch. 292, which became effective August 9, 1971, making such persons eligible for jury service, names of persons in that age group should have been added to the jury list before his trial, which was conducted in May of 1972.

The appellant does not deny that the jury list was drawn at the time specified by and according to the requirements of the applicable statute, RCW 2.36.060. Since the 1971 act did not change the date for compiling jury lists prescribed by RCW 2.36.060 or provide for the drawing of a special list, the clerk of the court was under no statutory duty to draw a supplementary list. Nevertheless the appellant suggests that the clerk should have anticipated that persons between the ages of 18 and 21 years would become eligible for jury service before the time prescribed for compiling a new list and should have included persons in this class on the list, even though none had registered to vote at that time and none were eligible to do so.

We do not find that the authorities cited by the appellant, *Ballard v. United States*, 329 U.S. 187, 91 L. Ed. 181, 67 S. Ct. 261 (1946), *Thiel v. Southern Pac. Co.*, 328 U.S. 217, 90 L. Ed. 1181, 66 S. Ct. 984, 166 A.L.R. 1412 (1946), and *Norris v. Alabama*, 294 U.S. 587, 79 L. Ed. 1074, 55 S. Ct. 579 (1935), support his contention. All of these cases concern the systematic and intentional exclusion of persons *eligible* to serve on the jury panel. None of them holds that affirmative action must be taken to include on a jury list persons who may become eligible to serve before the next list is drawn. The facts alleged by the appellant in this case do not show any deliberate exclusion of members of an eligible group and he does not suggest that the statute authorizing the procedure is invalid. We find this assignment of error likewise without merit.

Error is assigned to the denial of the appellant's motion for a separate trial, based on his contention that he could not have a fair trial because his codefendant had confessed. He relies upon *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968). The United States Supreme Court held in that case that because a codefendant who had confessed and implicated the appellant and whose confession was introduced in evidence, did not take the stand and could not be cross-examined, the appellant was denied a fair trial. Here the codefendant Davis did take the stand and testify. He was subject to cross-examination by the appellant. In fact, the story which he told on the witness stand was substantially the same as that told by the appellant. The appellant was not denied his right of confrontation, as was the appellant in *Bruton.*

The appellant was afforded a fair trial, in which the trial court exercised leniency in allowing him to present evidence and argue a theory of defense which is not recognized in the law. We find no error prejudicial to the appellant.

The judgment is affirmed.

HALE, C.J., FINLEY, HUNTER, HAMILTON, WRIGHT, and BRACHTENBACH, JJ., concur.

STAFFORD, J. (dissenting)—A joint trial of persons accused of crime has the advantage of conserving trial time for lawyers, witnesses, jurors and court personnel, as well as reducing the expenditure of public funds. It also has a certain tactical appeal because codefendants may be forced to adopt defensive positions antagonistic to each other. At the very least, the prosecution has an opportunity to tar two defendants with the same brush.

Nevertheless, the joint prosecution of defendants is fraught with real risks. Evidence properly admissible against one defendant may be inadmissible and exceedingly prejudicial to a codefendant. The danger is of sufficient magnitude that the advantages of a joint trial may be out-

weighed by the practical danger of an unfair trial. Such is the case before us.

The need for severance in the instant case began to develop as early as the pretrial hearing. It increased during the course of the trial when codefendant Davis testified on recross-examination. At that point Davis testified that he did not recall having told Dr. Lambert that he, Davis, told appellant he wanted to call the whole thing off but that appellant had replied "no way." The need for severance became more imperative when the prosecution attempted to impeach codefendant Davis by Dr. Lambert's rebuttal testimony. In effect, Dr. Lambert testified codefendant Davis related that appellant said "no way" in response to Davis' plea to "call the whole thing off."

Inasmuch as the codefendant's alleged statement was not made in appellant's presence, its recitation by Dr. Lambert was hearsay. Clearly, Dr. Lambert's testimony was prejudicial to appellant. It is equally clear that, had the trials been severed, Dr. Lambert's testimony would have been inadmissible against appellant, thus avoiding the resultant prejudice.

Granted, after the jury had been subjected to the foregoing testimony of Dr. Lambert, the trial court instructed them to consider it only with reference to codefendant Davis. Nevertheless, the prejudicial damage had been done. To ask the jury to ignore the prejudicial effect of the statement against appellant was to ask the impossible. They were asked to perform an act of mental gymnastics not only beyond their powers, but anyone else's. As stated by Mr. Justice Jackson, concurring in *Krulewitch v. United States*, 336 U.S. 440, 453, 93 L. Ed. 790, 69 S. Ct. 716 (1949):

> The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction.

The jurors could not be expected to unring a bell already rung. Under the facts of this case the admonition was a meaningless gesture. Nothing more clearly illustrates the impossibility of laymen complying with the admonition

than the fact that the prosecuting attorney himself succumbed to the temptation of using it against appellant. Twice in his final argument he mentioned "no .way" as being attributed to appellant. If he, as a lawyer, could not disregard the statement's application to appellant, how can it be argued that a lay juror could follow, or should be presumed to follow, the court's instruction with any greater success?

Prior to and during the trial, at the end of the state's case, and at the end of the trial, appellant Craig moved to sever his case from codefendant Davis' prosecution. He argued that the joint proceeding would deprive him of a fair trial. Appellant's several motions were denied.

Unfortunately, the predicted prejudicial error became a reality. It was not cured by the court's admonition to the jury. The trial court erred by failing to grant the requested severance of the case for trial. Additional, but connected, prejudicial error occurred in the testimony of Dr. Lambert. Under the circumstances of this case, the court's attempt to reduce the prejudicial effect of the testimony could not and did not succeed.

The trial court should be reversed and the cause remanded for a new trial as to appellant Craig.

UTTER, J., concurs with STAFFORD, J.

Petition for rehearing denied November 29, 1973.