IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32129-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LOUIS L. HANSON | ) | UNPUBLISHED OPINION |
| also known as LOUIS L. MONTOYA, | ) | |
| | ) | |
| Appellant. | ) | |

KORSMO, J. — Louis Montoya,[1] also known as Louis Hanson, shot and killed

Aaron Cummings, a member of a rival gang. His appeal from a conviction for first

degree murder and ensuing persistent offender sentence presents issues relating to the

jury instructions, his counsel's performance, and the prosecutor's cross-examination of

the defendant. Finding no harmful error, we affirm.

FACTS

The killing occurred on December 30, 2012, at the home of Mindee Deligt on

North Wall Street in Spokane. Mr. Montoya, a member of a Sureño gang, was

acquainted with Ms. Deligt for about four months. Earlier that afternoon he visited the

---

[1] Because the defendant identifies himself as Louis Montoya, we use that surname
in this opinion. Report of Proceedings (RP) at 797.

house for a brief period of time with a woman. After using the back bedroom for a while, the two left. According to Mr. Montoya, Ms. Deligt's dog jumped into his car and he decided to take it for a ride while he got dinner.

Mr. Montoya returned that evening. He testified that in the interim he had received a call from a friend asking him to retrieve a gun that had been stored between the mattresses in Ms. Deligt's bedroom. Mr. Montoya put on gloves in order to retrieve the gun without leaving fingerprints. He went in to the bedroom only to see Aaron Cummings standing in there. Montoya asked where his money was.[2] Seeing that Cummings wore red clothing and red shoes, he also asked if Cummings was a Norteño. Cummings confirmed his loyalty to that gang.

Believing that Cummings was about to attack him, Montoya struck the smaller man first, knocking him on to a bed.[3] Montoya bent over and the two men exchanged blows in that position before Cummings kicked Montoya in the face, forcing the larger man back. In his mind, Montoya believed the fight was over at that point. However, he then saw Cummings reach across his body with his right hand toward the edge of the bed.

---

[2] Mr. Montoya testified that he had one prior encounter with Mr. Cummings. On that occasion, Montoya had delivered drugs to Cummings, but before he could collect his payment, Montoya saw a group of gang members stripping his car. He ran to protect his property and did not receive his payment from Cummings. Montoya also learned from an acquaintance after the drug delivery that Cummings was a Norteño.

[3] Cummings weighed 126 pounds at the time of his death, while Montoya estimated he had been 200 pounds at the time of the crime and was 230-240 at trial.

Believing that Cummings was about to reach for the hidden gun, Montoya drew his own revolver and shot Cummings while running from the room.

The other witnesses told a somewhat different story. Ms. Deligt, Ms. Penny Pupo, and Ms. Lela Haisley were in the house visiting with Cummings when Montoya returned a short time after he had initially left the house. Montoya walked into the bedroom and confronted Cummings. Deligt and Haisley heard Montoya ask Cummings if he was a Norteño. All three testified that Montoya struck Cummings, knocking him down, and then shot him and fled. None of them saw Cummings reach for anything prior to the shooting. Cummings vomited blood in the bedroom, stumbled to the kitchen, and fell to the floor dead.

The prosecutor charged a single count of premeditated first degree murder, but successfully obtained an instruction on the lesser degree offense of second degree murder. The defense obtained the standard self-defense instructions requiring the prosecutor to disprove self-defense. Over defense objection, the court also gave the first aggressor instruction. The jury also was instructed that it could only consider the gang affiliation testimony for purposes of establishing motive or Mr. Montoya's state of mind.[4]

---

[4] The parties had stipulated before trial that both Montoya and Cummings were gang members and that gang evidence would be admitted. Both sides agreed that a limiting instruction would be used.

In closing, the prosecutor argued that the defendant's testimony of how the crime occurred was inconsistent with the physical evidence and that the defendant did not act in self-defense. Defense counsel argued that the two men were gang members living a different reality than other people and that the confrontation was normal to them, but the victim created the need for self-defense by going for a gun. The first aggressor instruction did not apply because it was Cummings, not Montoya, who created the need for self-defense. Counsel also argued that Montoya withdrew from the affair after getting kicked in the face, making it impossible for him to be the aggressor to the killing.

Nonetheless, the jury convicted Mr. Montoya of first degree murder while armed with a deadly weapon. The defense subsequently sought a new trial on the basis of the prosecutor's cross-examination of Mr. Montoya. The court denied the motion. The court then sentenced Mr. Montoya to life as a persistent offender. He timely appealed to this court.

## ANALYSIS

This appeal presents, in essence, three issues. Mr. Montoya first argues that the trial court erred in giving the first aggressor instruction. He also argues that his trial counsel was ineffective for failing to seek an instruction on revived self-defense. Finally, the defense argues that the prosecutor committed misconduct in cross-examining Mr. Montoya. We address the claims in the order noted.

4

*Aggressor Instruction*

Mr. Montoya argues that the court erred in giving the first aggressor instruction, contending that it was erroneous under the facts of this case and effectively waived his defense. The instruction was appropriate and did not have the effect he claims it did.[5]

Long settled standards govern this argument. Jury instructions are sufficient if they correctly state the law, are not misleading, and allow the parties to argue their respective theories of the case. *State v. Dana*, 73 Wn.2d 533, 536-537, 439 P.2d 403 (1968). The trial court also is granted broad discretion in determining the wording and number of jury instructions. *Petersen v. State*, 100 Wn.2d 421, 440, 671 P.2d 230 (1983).

Self-defense is only available to respond to the *unlawful* use of force. *State v. Riley*, 137 Wn.2d 904, 911, 976 P.2d 624 (1999). Thus, one who provokes another to lawfully act in self-defense is not responding to unlawful force and has no right of self-defense. *Id.* at 909. Juries must often sort out which party, if any, was justified in using force and which was not. "Where there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense, an aggressor instruction is appropriate." *Id.* at 909-910. If the evidence is in conflict about who precipitated an encounter, the instruction is appropriate. *State v. Davis*, 119 Wn.2d 657, 665-666, 835 P.2d 1039 (1992). Nonetheless, because an erroneous aggressor instruction effectively misstates

---

[5] Mr. Montoya also argues that the instruction was erroneous because there was no instruction given on revived self-defense, a topic that we address in the following section.

the State's burden of proof, the error seldom will be harmless. *Riley*, 137 Wn.2d at 910 n.2; *State v. Stark*, 158 Wn. App. 952, 960-961, 244 P.3d 433 (2010).

Focusing on the perceived effectiveness of the aggressor instruction against the defense case, Mr. Montoya argues that the instruction was erroneous, likening the situation to that in *Stark*. This approach fails in two respects. First, a proper aggressor instruction will always cut against a self-defense case; that does not make the instruction incorrect. Rather, that fact simply establishes why an erroneous aggressor instruction is harmful. Second, this case is not *Stark*.

There this court reversed a murder conviction because there was not sufficient evidence to support giving the aggressor instruction. 158 Wn. App. at 960-961. Because the erroneously given instruction was harmful to the defense, a new trial was required. *Id.* at 961.

Unlike *Stark*, the evidence supported giving the aggressor instruction in this case. The evidence was in dispute as to whether Montoya or Cummings had begun the altercation. The aggressor instruction was supported by the State's evidence—Mr. Montoya began a fight and then shot Mr. Cummings without provocation. If the jury agreed with that version of the evidence, then it needed to know that Mr. Montoya could not assert self-defense under those facts. If, as Mr. Montoya contended, Mr. Cummings started the conflict, according to its own terms the instruction would not apply and the jury could not use it to evaluate the self-defense claim.

6

Instruction 19 was supported by the evidence. The trial court did not err in using the instruction.

*Counsel's Effectiveness*

Mr. Montoya argues that his trial counsel erred by not seeking an instruction on revived self-defense. Because the evidence did not support giving such an instruction, trial counsel did not err.

Once again, well settled standards govern this argument. The Sixth Amendment to the United States Constitution guarantees the right to counsel. More than the mere presence of an attorney is required. The attorney must perform to the standards of the profession. Counsel's failure to live up to those standards will require a new trial when the client has been prejudiced by counsel's failure. *State v. McFarland*, 127 Wn.2d 322, 334-335, 899 P.2d 1251 (1995). In evaluating ineffectiveness claims, courts must be highly deferential to counsel's decisions. A strategic or tactical decision is not a basis for finding error. *Strickland v. Washington*, 466 U.S. 668, 689-691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on a claim of ineffective assistance, the defendant must show both that his counsel erred and that the error was so significant, in light of the entire trial record, that it deprived him of a fair trial. *Id.* at 690-692. When a claim can be disposed of on one ground, a reviewing court need not consider both *Strickland* prongs. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726, *review denied*, 162 Wn.2d 1007 (2007).

7

In this instance, Mr. Montoya has failed to establish that his counsel erred. As noted earlier, a jury instruction is only proper if it is supported by the evidence. *Stark*, 158 Wn. App. at 960-961. Revived self-defense involves the situation where a defendant engages in assaultive behavior and then withdraws from the encounter. If the original victim then initiates a new altercation, the defendant can use self-defense. *State v. Craig*, 82 Wn.2d 777, 783-784, 514 P.2d 151 (1973); *State v. Wilson*, 26 Wn.2d 468, 480-481, 174 P.2d 553 (1946). In order to revive the right to use self-defense, the defendant must show that he "in good faith had first withdrawn from the combat at such a time and in such a manner as to have clearly apprised his adversary that he in good faith was desisting, or intended to desist, from further aggressive action." *Wilson*, 26 Wn.2d at 480.

The evidence here did not establish this necessary showing. In his own testimony, Mr. Montoya did not indicate that he ever communicated to Mr. Cummings any interest in withdrawing from the attack. His testimony described the end of the fight and the decision to pull his gun:

> But he kicked me in my face, cut my bottom lip on the inside and hit my nose. And I kind of stumbled back like, all right, you know, whatever, I'm cool.
>
> Q. What do you mean by that?
>
> A. I'm done, you know. Have a seat, you know. I looked to see where he was at and he just—he gives me this crazy evil look like he's just disgusted and reaches with his right hand real fast over the left side of his body.

Report of Proceedings (RP) at 665. He then described the conclusion of the altercation:

8

> And I apologize to the courts, but excuse my language, but I just like, "Oh, shit, the gun." And I just pulled the revolver out from the front of my pants, and I was ready to run to the right to try to get out of the room, and I pointed the gun in his direction and fired one shot.

RP at 666.

Mr. Montoya gave the same description of the end of the encounter in cross-examination:

> No. I stumble back, after he kicked me in my face, maybe a foot, just two little quick steps back. And I look to see where he's at again and that's when he just gave me this evil look like he's just disgusted with me and reaches for what I believed was a weapon.

RP at 680.

This testimony falls far short of establishing that Mr. Montoya gave notice that he was withdrawing from the fight. First, nowhere in his testimony does Mr. Montoya even state that he communicated the intent to withdraw from the fight to Mr. Cummings. The most that can be drawn from the testimony is that once he was kicked in the face, Mr. Montoya decided he had had enough. However, he never verbalized that sentiment. None of the witnesses recalled Mr. Montoya saying anything at all other than asking about Cummings' gang affiliation. Second, all of the witnesses, including Mr. Montoya, described the shooting as occurring right after Mr. Montoya was pushed back. RP at 447-448, 531, 554. According to his own testimony, there was no time to announce a withdrawal from the fight. Finally, his testimony confirmed that he only withdrew—if at all—when he fled the scene after firing the fatal shot.

9

The evidence did not establish that there was a basis for instructing the jury on the concept of revived self-defense.[6] Accordingly, defense counsel did not err by failing to request an instruction that was not supported by the evidence.

Mr. Montoya failed his burden to establish that his attorney provided ineffective assistance. The case was properly tried according to the instructions that fit the facts of the encounter.

*Prosecutorial Conduct*

Lastly, the defense contends that the prosecutor engaged in misconduct, primarily during his cross-examination of Mr. Montoya. The trial court previously determined that any error was not harmful. We agree.

The appellant bears the burden of demonstrating prosecutorial misconduct on appeal. *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997). The appellant must establish that the conduct was both improper and prejudicial. *Id.* Prejudice occurs where there is a substantial likelihood that the misconduct affected the jury's verdict. *Id.* at 718-19. Reversal is not required where the alleged error could have been obviated by a curative instruction that the defense did not request. *State v. Gentry*, 125 Wn.2d 570,

---

[6] Nonetheless, defense counsel took advantage of the absence of an instruction and argued to the jury that his client withdrew from the encounter even though an instruction on the topic would have advised the jury that Mr. Montoya's conduct did not meet the requirements for withdrawal. RP at 772. He had the best of both worlds here by getting to make an argument without having a jury instruction contradict his claim.

10

596, 888 P.2d 1105 (1995). Moreover, a defendant's failure to object constitutes a waiver unless the remark is deemed so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury. *Id.* The question of prosecutorial misconduct is reviewed for abuse of discretion. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

The initial problems here involve both the scope and standard of review of this argument. The defense sought a new trial on similar grounds prior to sentencing, but here Mr. Montoya bypasses that issue and argues the misconduct claim without regard for the trial court's rulings. Mr. Montoya also has expanded his argument and asks for more lenient review standards due to his prior objections.

Typically we review a trial court's decision on whether to declare a mistrial or grant a new trial for abuse of discretion. *E.g., State v. Weber*, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983) (mistrial); *State v. Marks*, 71 Wn.2d 295, 302, 427 P.2d 1008 (1967) (new trial). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). "The question is not whether this court would have decided otherwise in the first instance, but whether the trial judge was justified in reaching his conclusion." *State v. Taylor*, 60 Wn.2d 32, 42, 371 P.2d 617 (1962). As noted in *Lindsay*, we also review prosecutorial misconduct allegations for abuse of discretion. 180 Wn.2d at 430. Since both the new trial argument and the direct prosecutorial misconduct argument present the

11

same standard of review in this court, we conclude that the failure to challenge the new trial ruling on appeal does not limit the scope of this court's review.

A somewhat different question is presented by Mr. Montoya's error preservation claim argument. As noted above, questions of prosecutorial misconduct are waived if not challenged at trial unless the error was so egregious that it was beyond the ability of the trial court to cure it. *Gentry*, 125 Wn.2d at 596. Here, Mr. Montoya challenges some of the prosecutor's actions that he did not challenge at trial, but argues that the objections he did make apply to all instances of alleged misconduct here. He contends that *Lindsay* supports his argument. It does not.

At issue in *Lindsay* was whether defense counsel's challenge to the entire tenor of the prosecutor's argument, brought by way of motion for a mistrial at the end of the prosecutor's rebuttal argument, preserved the defendant's right to challenge the closing arguments. 180 Wn.2d at 430-431. The court concluded that it did, relying on the decision in *United States v. Prantil*, 764 F.2d 548, 555 n.4 (9th Cir. 1985). 180 Wn.2d at 431. The court noted that a motion for mistrial brought immediately after argument served the goal of the contemporaneous objection rule because it allowed the trial court an opportunity to remedy an error by crafting a cautionary instruction. *Id.* at 441.

In contrast to *Lindsay*, the facts of this case are inconsistent with the purpose of the contemporaneous objection rule. Unlike *Lindsay* where the mistrial motion was timely enough to allow the trial court to act when the jury was about to begin its

12

deliberations, here the new trial motion was heard several weeks after the jury had returned its verdict. There was no opportunity for the trial court to cure any errors. Accordingly, we decline to apply *Lindsay* in the manner sought by Mr. Montoya. One objection does not preserve any and all future arguments a defendant may want to make on appeal. Instead, we will apply the well settled standards of our case law. A properly challenged statement will be reviewed for a "substantial likelihood" that it affected the verdict, while unchallenged statements will be considered only if the error was too egregious for a timely objection to be worthwhile.

With these preliminary issues concluded, we now turn to the appellant's actual arguments.

*Cross-examination on purpose of gang membership.* Mr. Montoya argues that the prosecutor committed misconduct in asking a series of questions about why people joined gangs, if they did so to commit crimes, and whether he or other members committed crimes. RP at 669-670. Mr. Montoya never answered any of these questions, other than to deny that he joined a gang with the intent of committing crimes. RP at 669. Mr. Montoya argues that the asking of the questions themselves suggested a propensity to commit crime even though he did not object on such grounds at trial.[7]

---

[7] While counsel made a number of objections, the only objection he identified was that the question was outside the scope of direct examination. It is doubtful that an unidentified objection preserves an evidentiary challenge for appeal. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). We will, however, consider the challenges in

13

In order to review this argument, it is necessary to look at the peculiar factual circumstances of this case. Despite submitting a motion to exclude ER 404(b) evidence, the defense stipulated that "gang" evidence would be admissible. RP at 13. In particular, the defense stipulated that both Mr. Montoya and Mr. Cummings were active gang members at the time of their fatal final encounter. RP at 14-15.

The State did not put on any gang testimony. The defense called the State's gang expert as its first witness and solicited information consistent with the stipulation. The prosecutor asked a single question on cross-examination. The defense concluded its case with Mr. Montoya taking the stand. After Mr. Montoya identified himself, the first question counsel asked was whether he was a gang member. Mr. Montoya then discussed his history as a gang member as well as his family's history. Beginning in Los Angeles, where he was the third generation of his family to be made a gang member, Mr. Montoya's family moved to Spokane as a condition of his grandmother's release from prison on parole. He explained that in both California and Spokane, he was a gang member for "survival." RP at 654-655. He had to "either swim with the sharks or sink to the bottom." RP at 653. He had been "rushed" into the Sureño gang at age 13 by fighting three other "street soldiers." RP at 654. He worked "tagging" property and marking territory for his gang. He confirmed for his attorney that he had been convicted

---

light of our ultimate conclusion that they are unavailing.

14

of first degree robbery at age 19. He also explained what happens when one gang member encounters an opposing gang on its territory—there "at the very least would be a fight" and the presence of weapons might lead to a progression. RP at 656.

After explaining gang life, Mr. Montoya turned to his previous encounter with Mr. Cummings when he delivered methamphetamine without getting paid. He then described the events of December 30, 2012 up to fleeing the house after shooting Cummings. When it came time for cross-examination, the prosecutor began by returning to Mr. Montoya's "sharks" comment. Mr. Montoya agreed that he could be considered a shark. He also told the prosecutor that killing a rival gang member "could" give a person higher gang status. RP at 669. The prosecutor then turned to the questions that Mr. Montoya now challenges as improper.

Both parties essentially used Mr. Montoya as an expert whose testimony explained how the gang lifestyle factored into this crime. The defense painted the picture of the gang mindset as it ultimately played out for the two rivals who fought in Ms. Deligt's bedroom, while the prosecutor used that information to develop the motive behind the crime. As Mr. Montoya was quite familiar with gang life, the prosecutor understandably asked him about the purposes of gangs.

In this context, it is doubtful that the unanswered questions constituted misconduct by the prosecutor. Mr. Montoya testified on direct examination to some of the crimes he

15

committed after joining the Sureño. The prosecutor could properly ask about the purpose behind those crimes.

Nonetheless, even if Mr. Montoya preserved a claim of error here and the prosecutor's questioning was improper, there was no realistic possibility that the verdict was affected. The defense, after all, opened up the entire topic of gang membership and gang lifestyle to explain the defendant's mindset when dealing with an opposing gang member and why he perceived mortal danger requiring him to shoot another human being. With both defendant and victim being gang members, the gang evidence applied equally to both sides of the case. If the gang lifestyle evidence was prejudicial to one, it was prejudicial to the other. Considering the complete context of this issue, the challenged questions did not have an impact on the verdict. They did not constitute evidence and were only a small portion of the picture of this case. There was no prejudicial error.

*Prosecutor's closing argument.* Mr. Montoya also challenges portions of the prosecutor's closing argument. He did not challenge the argument at trial and it was not a part of the mistrial motion. Accordingly, we review this claim to see if there was such prejudicial error that it could not have been cured by the trial court.

During closing arguments, alleged misconduct is considered in the context of the total argument, the evidence addressed therein, jury instructions, and the issues of the case. *State v. Turner*, 167 Wn. App. 871, 882, 275 P.3d 356 (2012). A prosecutor has

16

wide latitude during closing, and may express to the jury reasonable inferences derived from the evidence. *Id.*

The initial argument in question occurred during the early stages of the prosecutor's closing argument. Describing the scene in the bedroom:

> the defendant stepped back, pushed back, reached in and pulled out his gun. Mr. Cummings was laying on the bed. With his gloved hand, with a gun that he's not supposed to have, he shoots, basically, at point blank range, Mr. Cummings. He shoots him. Now, not trying to scare him. You saw pictures of the bedroom. You saw the layout. I would suggest to you if you're four or five feet away *and you're a gang member and violence is the way you do business, you know how to scare somebody with a gun and not hit them.* I think you can draw that inference. So do the facts as Mr. Montoya talked about them make sense? No.

RP at 749 (emphasis added).

Emphasizing the italicized language, Mr. Montoya contends that the remarks improperly reference facts not in evidence. The underscored remarks explain the context of the argument—the prosecutor was attempting to draw inferences from the testimony and explain why Mr. Montoya's version of events did not make sense. While Mr. Montoya correctly states that he never testified that "violence is the way" he conducted his business, he also testified on direct examination that when confronting a rival gang member, a fight would be the minimum expected and the presence of weapons might make it worse; he also testified that he carried a gun even though it was illegal for him to do so. Whether or not the prosecutor was drawing a proper inference from that testimony could have been debated at trial. It was not. A timely objection, however, would have

17

resolved the situation. Either the prosecutor could have explained further the basis for the inference or the trial court could have taken action to correct any perceived error. If there was any error here, it clearly was not so egregious that it was beyond cure. The failure to object waived this challenge.

Mr. Montoya also argues, again correctly, that there was no evidence that he was accomplished enough with firearms to "know how to scare somebody with a gun and not hit them." It appears that the prosecutor, emphasizing the "point blank range" nature of the shooting, was drawing the inference that anyone using a firearm at that distance was trying to wound or kill rather than scare the victim. However, by tying the inference to the defendant's undocumented shooting skills, the prosecutor moved beyond the record of the case. Nonetheless, again, this error was not so egregious that an objection would have been unavailing. The claim is waived.

Mr. Montoya also argues that the prosecutor leaped beyond the record of the case by arguing that the defendant "talked about increasing his status in a gang by doing violent acts, by committing crimes, by even committing homicide." RP at 752. The context of the quoted remarks was a portion of the argument where the prosecutor was contending that Mr. Montoya had the smaller man at a disadvantage and was beating him so that there was no reason to shoot. Mr. Montoya technically is correct that he never stated that his motivation for this killing was to further his gang status. The prosecutor arguably could ask jurors to draw the inference that this crime was undertaken to increase

18

status since Mr. Montoya had agreed that killings "could" do so. Nonetheless, Mr. Montoya did not claim that motivation during his testimony, and the prosecutor erred to the extent that he argued otherwise. But, once again, this is not an argument that was beyond the trial court's ability to cure upon timely objection. The prosecutor may have misstated what Mr. Montoya actually said, but a rephrasing of the argument would have been proper based on the evidence in the record.

Accordingly, we conclude that this aspect of the misconduct argument is without merit. Mr. Montoya put a significant amount of gang evidence into the trial in order to establish the foundation for his self-defense argument. The prosecutor was properly allowed to test and challenge that information and use it for arguing that the defendant's motive was other than what he claimed. To the extent that the prosecutor's argument misstated any of the defendant's testimony or went beyond it, he did not inject new evidence into the case and his comments were not so far afield that the trial judge could not have addressed them if requested to do so.

The challenge to the closing argument was waived by the failure to object at trial.

*Cross-examination concerning identity of others.* Finally, Mr. Montoya also argues that the prosecutor shifted the burden of proof by demanding that he identify other people he discussed during his testimony. We again doubt that there was any error here, but we are certain that there was no prejudicial error.

19

It also is inappropriate argument for a prosecutor to suggest that the defendant

bears any burden of proof. *State v. Fiallo-Lopez*, 78 Wn. App. 717, 728-729, 899 P.2d

1294 (1995). However, once a defendant presents evidence, a prosecutor can fairly

comment on what was not produced. *State v. Barrow*, 60 Wn. App. 869, 871-873, 809

P.2d 209, *review denied*, 118 Wn.2d 1007 (1991); *State v. Contreras*, 57 Wn. App. 471,

788 P.2d 1114, *review denied*, 115 Wn.2d 1014 (1990). The parties understandably

differ where on this continuum the challenged questions fell.

There were three instances in which the prosecutor, while cross-examining Mr.

Montoya about his version of the events, asked him to identify the person he was

referencing. In the first instance, Mr. Montoya was at the house of an "acquaintance" to

perform tattoo work. When asked for the name of the acquaintance, Mr. Montoya

refused to give it because that person "doesn't need to be involved." RP at 671. There

was no objection. The prosecutor responded by indicating that the unnamed

acquaintance "can't corroborate what you're saying; is that what you're saying?" RP at

672. The court sustained defense counsel's objection.

When the prosecutor asked the defendant for the name of the girlfriend whom he

brought to Ms. Deligt's house, Mr. Montoya answered that he was there "to speak about

my actions alone." RP at 673. There was no objection to the question or answer, nor did

the prosecutor follow up on the line of questioning. The prosecutor also asked for the

name of the friend who asked him to pick up a gun at Ms. Deligt's house. Mr. Montoya

20

simply answered, "I do not wish to speak on that." RP at 674. Again, counsel did not object.

Finally, the prosecutor asked if anyone had seen the injuries Mr. Cummings allegedly inflicted on Mr. Montoya. He answered, "No." RP at 679. When asked if Detective Mark Burbridge had previously testified that he did not see any injuries on Mr. Montoya, defense counsel objected on the basis that the testimony already was in the record. The court sustained the objection. RP at 680.

Mr. Montoya now contends that each of these four instances involved improper burden shifting. He did not challenge any of the four identity questions at trial and cannot do so now. *Guloy*, 104 Wn.2d at 422. Nor did any of those four questions constitute burden shifting. The first three asked for the names of individuals identified by Mr. Montoya in his testimony; he refused to divulge the identities. In the fourth instance the prosecutor simply asked if there were any witnesses to Mr. Montoya's alleged injuries. Not one of these questions suggested that Mr. Montoya had any burden of proving the identities.

The closest any of these questions came to burden shifting was the corroboration question. In that instance defense counsel objected and the trial court sustained the objection. If that question was improper, it also was harmless. The question was dealt with in the manner requested by the defense. Again, on its face, the question asked if the acquaintance could corroborate Mr. Montoya's testimony. The question did not suggest

21

that Mr. Montoya had any duty to corroborate the testimony. The trial court's response was more than adequate.

In the big scheme of this trial, these questions amounted to nothing. The prosecutor was attempting to test Mr. Montoya's story by implying that it was made up and not supported. Mr. Montoya was attempting to avoid having his friends entangled in his problem. The belatedly challenged testimony did not shift the burden of proof to Mr. Montoya.

This case was well tried by both sides. The gang membership testimony was critical to the defense theory of the case. The prosecutor did not err by also making use of the testimony. To the extent the prosecutor erred at all, the error was harmless.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Korsmo, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

22