IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34360-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| MICHAEL LEE GEHRKE, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Michael Gehrke appeals his conviction for first degree manslaughter, a charge the trial court allowed to be added by amendment at the conclusion of the State's evidence, but before it rested. Mr. Gehrke argues the late timing of the amendment prejudiced his substantial right to notice of the charge and a reasonable opportunity to defend against it. He also challenges the trial court's giving of a first aggressor instruction without instructing the jury on a first aggressor's revived right to defend himself following a retreat. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

Four days after a street fight with Michael Gehrke in September 2015, Christopher Pineyro died from a stab wound sustained in the fight that severed his carotid artery and jugular vein. There was conflicting evidence whether Mr. Gehrke initiated the fight or

was defending himself following a threat and assault by Mr. Pineyro. Within a couple of months, the State decided to charge Mr. Gehrke with second degree felony murder predicated on assault.

The case proceeded to trial three months later. On the morning of the first day of trial, the prosecutor informed the trial court that he was considering amending the charges to include manslaughter in the first degree as an alternative. He told the court he had spoken to defense counsel about amendment that morning and defense counsel objected. For that reason, the prosecutor said, he was not presently asking for such an amendment, "but I did put [the defense] on notice that, at the conclusion of the State's case, I may be moving for that to be charged in the alternative." Verbatim Report of Proceedings (VRP) at 122. The parties then proceeded to other pretrial matters and to trial.

Trial witnesses included three eyewitnesses to the fight between Mr. Gehrke and Mr. Pineyro. The State's first witness was Ty Olmstead, who was driving home when his path was blocked by a white SUV and two men moving into the middle of the road. One, whom he later learned was Mr. Pineyro, was approaching on a bicycle and slowed down as he approached the other, who Mr. Olmstead later learned was Mr. Gehrke. Mr. Gehrke was outside the SUV and approached Mr. Pineyro. According to Mr. Olmstead, upon reaching Mr. Pineyro, Mr. Gehrke kicked him, causing both the bicycle and Mr. Pineyro to fall to the ground. Mr. Olmstead noticed that Mr. Gehrke was holding what appeared to be a cell phone, but after Mr. Pineyro was on the ground Mr. Olmstead saw

that it was a knife, and that Mr. Gehrke had flipped open its blade. Mr. Pineyro stood up and produced a hammer, after which Mr. Olmstead described the two men as "sparring, debating on who was going to strike first." VRP at 176. Mr. Olmstead testified that the two men swung their weapons at one another, moving away from Mr. Olmstead's car, until Mr. Gehrke stabbed Mr. Pineyro and Mr. Pineyro fell to the ground, holding his neck. Mr. Olmstead testified that at that point, Mr. Gehrke stood there for a second, then threw down his knife, held up his hands and said "'self-defense, self-defense.'" VRP at 178. Asked by the prosecutor "who initiated this confrontation between the two individuals," Mr. Olmstead answered, "Mr. Gehrke." VRP at 179.

Jill Swenson, a roommate of Mr. Gehrke's girlfriend, testified on his behalf. She and Mr. Gehrke's girlfriend had been running errands with Mr. Gehrke that day. Mr. Gehrke's girlfriend, who was driving the white SUV encountered by Mr. Olmstead, had returned home to drop off Ms. Swenson. Ms. Swenson testified she was walking toward the house when she heard yelling and turned around. She saw Mr. Pineyro and Mr. Gehrke in the middle of the street, and saw that Mr. Pineyro was swinging a hammer at Mr. Gehrke. According to Ms. Swenson, Mr. Gehrke was dodging Mr. Pineyro's attempted blows, moving side to side and backward. She testified that she saw Mr. Pineyro swing the hammer at Mr. Gehrke "at least five" times but saw Mr. Gehrke strike at Mr. Pineyro with his knife only once, striking him "on the jugular." VRP at 569-70. Mr. Pineyro fell to the ground. Ms. Swenson testified that after that happened, she

3

returned to the front passenger seat of the SUV and she and Mr. Gehrke's girlfriend drove off, calling 911 as they left. Mr. Gehrke stayed behind.

Mr. Gehrke testified in his own defense. He told the jury he met Mr. Pineyro two years earlier, when Mr. Gehrke was living with a prior girlfriend. Mr. Pineyro would visit the girlfriend's daughter and Mr. Gehrke eventually had a "heated discussion" in which he told Mr. Pineyro he was no longer welcome in the home. VRP at 661. Mr. Gehrke said he had had a second run-in with Mr. Pineyro months later at a convenience store, where Mr. Pineyro threateningly brandished a baton or club and Mr. Gehrke suggested they meet up the road if Mr. Pineyro wanted to fight. Mr. Pineyro did not show up.

Mr. Gehrke testified that on the day he fatally injured Mr. Pineyro, he was standing outside his girlfriend's SUV, smoking and checking his phone for messages, when he saw someone riding a bicycle toward him. He realized it was Mr. Pineyro, and when Mr. Pineyro flashed a menacing smile, Mr. Gehrke walked around the SUV to where Mr. Pineyro was pulling up in the street. Mr. Pineyro said to Mr. Gehrke "I've got something for you," and, straddling the bicycle, began taking off his backpacks and reaching behind himself. VRP at 674. This made Mr. Gehrke nervous. Mr. Gehrke testified he "reacted" and kicked Mr. Pineyro's bicycle frame, causing the falling bicycle to take Mr. Pineyro to the ground. VRP at 680. When Mr. Pineyro got up, he had armed himself with a hammer. Mr. Gehrke claims it was only then that he reached for a knife

that was clipped to his waistband. According to Mr. Gehrke, he didn't even flip the blade open until Mr. Pineyro swung the hammer at him.

As Mr. Pineyro was making "lunging-type" swings, Mr. Gehrke testified that he was "backing up. I'm dodging it." VRP at 688. "[W]hen [the hammer] would get close to me, I would dodge, or, you know, kind of move out of the way so I wouldn't be struck with it." *Id*. When cross-examined, he elaborated on what he meant by "backing up":

> Q. And then your testimony is, you start backing away and retreating; is that correct?
> A. Well, yeah, I wasn't going to move forward to get hit with the hammer so I did back away.
> Q. You've testified before you're not the type of person to run away from a fight; isn't that true?
> A. No. I was raised in a family with a lot of military tradition and we face our fears.
> Q. You weren't retreating and leaving the scene, were you, sir, at this point?
> A. I was not retreating or leaving the scene at any moment. I was retreating from being hurt.

*Id.* at 709.

When Mr. Gehrke's backing up had taken him near a fence, limiting his ability to dodge the hammer, he struck at Mr. Pineyro twice with the knife, stabbing him first in the arm and then in the neck. When he saw Mr. Pineyro grab his neck, stumble backward, and saw a lot of blood, he knew Mr. Pineyro was badly injured.

Mr. Gehrke returned to the SUV where he spoke to his girlfriend and Ms. Swenson, telling them he had done nothing wrong, was not going anywhere, and would wait for police to arrive. The two women drove off.

Police and paramedics arrived. Mr. Pineyro was taken to Sacred Heart Medical Center. Mr. Gehrke identified himself to police officers, saying "I'm the guy. I stabbed him and it was self-defense." VRP at 334. He was removed from the scene by an officer who later drove him to be interviewed by Detective Brian Cestnik.

The detective's video recorded interview of Mr. Gehrke was played for the jury. During it, Mr. Gehrke told Detective Cestnik that he knew Mr. Pineyro always carried a weapon and "I thought he was pulling a gun on me at first . . . so I defended myself . . . I [knew] my life was in danger so I did what I had to do." Ex. P-92 at 8 hrs., 22 min., 38 sec. through 8 hrs., 23 min., 32 sec. Later in the interview, he told the detective it was obvious that Mr. Pineyro did not "know how to fight or even how to nail in a nail." Ex. P-92 at 8 hrs., 36 min., 20 sec.; VRP at 711. Asked if he was ever hit by Mr. Pineyro, Mr. Gehrke said, "No, I'm too fast for that." Ex. P-92 at 8 hrs., 46 min., 40 sec.

After the State called its last witness but before resting, the prosecutor moved to amend the information to add the manslaughter charge, as forewarned. He said he intended to rest at that point "irregardless of the Court's decision." VRP at 543.

Defense counsel objected to the amendment, stating:

6

The manslaughter charge has into it a reckless standard. I would first suggest that there's no probable cause to charge manslaughter in this case because all the testimony that we've heard elicited to this point was that this was an intentional act of self-defense, not an act of recklessness. Were the Court to find there's probable cause to allow the amendment, defense would have likely looked for an opportunity to then potentially get a self-defense expert that would show that Mr. Gehrke's actions were not reckless but an appropriate use of force in self-defense. That's not an issue under the felony murder. All that matters was the fact that we have a justifiable homicide, but for the issue of recklessness that issue could have been something that we may need additional preparation or maybe even potentially additional witnesses. So I do think there is a substantial prejudice to the defense's ability to present the case by allowing this amendment after the trial is already commenced and after the State's case is nearly completed.

VRP at 544-45.

The trial court granted the State's motion, explaining that Mr. Gehrke's defense to a first degree manslaughter charge was "essentially the same" as the defense he had presented to the second degree murder charge. *Id.* at 550. As for defense counsel's statement that he would have engaged a self-defense expert, the court stated, "[Y]ou could have also employed a self-defense for the initial charge of murder in the second degree. That's a strategy situation that isn't affected either way." *Id.*

Following the defense case, the court entertained objections to its jury instructions. The defense had previously objected to giving the Washington pattern "first aggressor"

7

instruction[1] and restated its objection, reminding the court that comments to the pattern instruction state that the instruction is to be used sparingly. The trial court responded that "used sparingly doesn't mean you shouldn't use it when it applies." VRP at 734.

If the first aggressor instruction was to be given, the defense asked that the trial court also give what it referred to as a "withdrawal" instruction, based on *State v. Craig*, 82 Wn.2d 777, 514 P.2d 151 (1973). Its proposed instruction stated in relevant part that even a first aggressor has a revived defense of self-defense if "the provoker . . . in good faith withdraws from the combat at such time and in such a manner as to clearly apprise the other person that he or she was desisting or intended to desist from further aggressive action." Clerk's Papers (CP) at 87. The trial court declined to give the instruction, noting that it was not a pattern instruction and finding that there was no evidence Mr. Gehrke withdrew in the manner described.

The jury found Mr. Gehrke not guilty of second degree felony murder but guilty of first degree manslaughter. It made a special finding that Mr. Gehrke committed the crime

---

[1] The pattern instruction states: "No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill, use, offer, or attempt to use force upon or toward another person. Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.04, at 256 (4th ed. 2016).

with a deadly weapon. The trial court sentenced Mr. Gehrke to a total of 124 months'

confinement. Mr. Gehrke appeals.

ANALYSIS

Mr. Gehrke assigns error to the trial court's decisions (1) granting the State's

motion for leave to amend the information, given its timing, and (2) refusing to give Mr.

Gehrke's proposed withdrawal instruction. We address the issues in that order.

*Amendment of the information*

CrR 2.1(d) deals with the amendment of an information. It provides that a trial

court has discretion to permit amendment of an information "at any time before verdict or

finding if substantial rights of the defendant are not prejudiced." CrR 2.1(d). A

defendant objecting to amendment bears the burden of showing prejudice. *State v.*

*Brown*, 74 Wn.2d 799, 801, 447 P.2d 82 (1968). If a defendant is misled or surprised by

an amendment, he is entitled to move for a continuance if needed to prepare a defense.

*Id.* "The fact a defendant does not request a continuance is persuasive of lack of surprise

and prejudice." *State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982).

We review a trial court's decision to allow amendment for abuse of discretion.

*State v. Guttierrez*, 92 Wn. App. 343, 346, 961 P.2d 974 (1998). A trial court abuses its

discretion when its decision is manifestly unreasonable, based on untenable grounds, or

exercised for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482

P.2d 775 (1971).

Mr. Gehrke argues in part that by allowing the State to amend the information before resting but after stating it had presented all of its evidence, the trial court violated the spirit if not the letter of a per se rule adopted by our Supreme Court in *State v. Pelkey*, 109 Wn.2d 484, 487, 745 P.2d 854 (1987). In that case, the State rested, the defense moved to dismiss the charge for insufficient evidence, and the State responded with a motion to add a charge it *had* proved. Our Supreme Court observed that while the timing was literally permissible under CrR 2.1, the criminal rule "necessarily operates within the confines of article 1, section 22" of the Washington Constitution, which protects a defendant from being tried for an offense not charged. *Id.* at 490. The court expressed concern that where an amendment is allowed after the State rests, "[a]ll of the pretrial motions, voir dire of the jury, opening argument, questioning and cross examination of witnesses [have been] based on the precise nature of the charge alleged in the information," making a defendant "highly vulnerable" to confusion or prejudice. *Id.* The per se rule it adopted is that a criminal charge may not be amended after the State rests its case in chief unless the amendment is to a lesser degree of the same charge or a lesser included defense. *Id.* at 491.

A few years later, the court held in *State v. Schaffer* that there was "no need to redraw the line established in *Pelkey* to a point earlier in the criminal process"—in particular, no need to extend the rule to midtrial amendments. 120 Wn.2d 616, 622, 845 P.2d 281 (1993). It found that CrR 2.1(d)'s standard for amendment was adequate,

because it recognizes the "precise evil that article 1, section 22 was designed to prevent": charging documents that prejudice the defendant's ability to mount an adequate defense by failing to provide sufficient notice. *Id.* at 620. The rule allows the trial court to assess prejudice in each case on its facts. *Id.*

Applying CrR 2.1(d), *Pelkey* and *Schaffer* to this case, the trial court did not abuse its discretion in finding that Mr. Gehrke would not be prejudiced by the amendment. His defense to the second degree murder charge was always self-defense. *See, e.g.*, CP at 25, 36, 71, 79, 81, 82, 83 and 89 (all mentioning or discussing Mr. Gehrke's claim of self-defense). His argument that he might have engaged a self-defense expert if first degree manslaughter had been charged earlier is therefore not persuasive. And Mr. Gehrke did not request a continuance, further undercutting his claim of prejudice.

The absence of prejudice is clearer here than it was in the controlling case of *Schaffer*. As in *Schaffer*, the State in this case made its motion after calling its last witness but before resting. But in *Schaffer*, the State did not give notice of its interest in amending until it had called its next to last witness. Here, Mr. Gehrke was aware of the possibility of amendment before the trial started, even if only a few hours before it started. Mr. Gehrke does not demonstrate an abuse of discretion.

11

No. 34360-0-III
*State v. Gehrke*

*Contention that "withdrawal" instruction should have been given
along with any "first aggressor" instruction*

Mr. Gehrke does not contend on appeal that it was error for the trial court to give the first aggressor instruction. He contends only that it was error to refuse to give a companion withdrawal instruction.

Jury instructions are sufficient if they permit the parties to argue their theory of the case and properly inform the jury of the applicable law. *State v. Riley*, 137 Wn.2d 904, 909, 976 P.2d 624 (1999). A jury instruction need be given only if it is supported by the evidence presented at trial. *State v. Stark*, 158 Wn. App. 952, 960, 244 P.3d 433 (2010).

A first aggressor can invoke the right of self-defense to justify a homicide if he in good faith has withdrawn from the combat, clearly communicated that withdrawal to his adversary, and the adversary persists in the attack. *Craig*, 82 Wn.2d at 783-84. While Mr. Gehrke's proposed instruction accurately stated the law, the trial court reasonably concluded that there was no evidence of such a withdrawal by Mr. Gehrke. The walking backward that Mr. Gehrke did during his fight with Mr. Pineyro was not a withdrawal from the conflict; by all reports, including his own, he continued to face Mr. Pineyro and was only dodging attempted blows. As Mr. Gehrke testified, "I was not retreating or leaving the scene at any moment." VRP at 709. He was not entitled to the instruction.

12

No. 34360-0-III
*State v. Gehrke*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

13